GREER ET AL., APPELLANTS, *v.* STANNARD ET AL., RESPONDENTS.

(No. 6,434.)

(Submitted April 6, 1929.   Decided May 22, 1929.)

[277 Pac. 622.]

80

*Mr. T. H. MacDonald, Mr. C. S. Baldwin* and *Messrs. Hurd, Hall & McCabe,* for Appellants, submitted an original and a reply brief; *Mr. H. C. Hall* and *Mr. E. J. McCabe* argued the cause orally.

*Mr. C. H. Foot, Mr. G. H. Grubb* and *Messrs. Logan & Child,* for Respondents, submitted an original and supplemental brief; *Mr. S. M. Logan,* argued the cause orally.

82

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Appeal from a judgment of dismissal on the merits, and for costs, entered in an action for an accounting and to impress with a trust certain oil leases.

In May, 1927, plaintiffs, as stockholders in the Flathead Oil Lands Company, for the corporation commenced action against the corporation, alleging demand upon the directors and refusal to institute the action, and against the Kalispell-Kevin Oil Company, a common-law trust, and George F. Stannard, James K. Lang, Charles Emmons, and John M. Carlson, as trustees and as individuals. Hereafter the Flathead Oil Lands Company will be referred to as the corporation, and the Kalispell-Kevin Oil Company as the syndicate.

The material allegations of the complaint, briefly summarized, are: That the corporation was organized in May, 1920, for the declared purpose of acquiring, by lease or otherwise, lands in Flathead county, or elsewhere in North America, for exploration and operation for oil. That the plaintiffs, the individual defendants and others, subscribed thereto $4,850 for which 9,300 shares of the capital stock of the corporation were issued to them, according to the amounts subscribed. That Stannard, Lang and Emmons were named the first directors

and elected as the officers of the corporation and continued in such positions until January 29, 1927.

That, immediately on organization, the corporation employed one Ralph Arnold, of Los Angeles, California, "an expert geologist of international reputation, whose advice * * * was of extreme value" to "advise and inform" the corporation as to territory wherein it would be advisable to secure oil leases and to examine and report on leases obtained. That during the month of May, 1920, the three directors named and Carlson, as an employee and agent for the corporation, were advised by Arnold, while employed by the corporation, that the area near Shelby, Montana, now known as the Kevin-Sunburst oil field, was promising and that it would be advisable to secure leases therein. That, for his services so rendered, Arnold was paid $2,750 from the funds of the corporation. That these four defendants, acting on the advice received, sent Emmons to the territory described, and there, during the summer and fall of 1920, he secured leases on the lands recommended which were thereafter, pursuant to his employment, examined and approved by Arnold, and that the corporation is therefore entitled to the ownership and possession of the leases and to the rents, issues, and profits thereof. That in August, 1921, these defendants, as officers and directors of the corporation, spent the sum of $66, and as plaintiffs verily believe additional sums, from the corporation treasury in holding and protecting the leases.

That in March, 1921, these directors and officers of the corporation formed the defendant syndicate and assigned to it the leases described and wrongfully and unlawfully hold and operate the leases to the exclusion of the stockholders of the corporation and in disregard of the duties and obligations of these defendants named as directors and officers of the corporation. That the corporation was at all times able, willing, and ready to have financed the securing and operation of the leases, but these individual defendants made no demand upon it or its stockholders and concealed the facts from their asso-

ciates. That the leases have become valuable, are now worth $3,000,000 and have paid dividends of $1,000,000, of which these four defendants have received approximately $400,000. That the plaintiffs did not acquire knowledge of the facts until June, 1926.

The answer admits the organization of the corporation and of the syndicate as alleged, but alleges that the corporation was organized, and Arnold was employed, solely for the purpose of determining the long disputed question as to whether or not lands in Flathead Valley were underlaid by oil, and that, on receiving an adverse report from Arnold, the corporation became dormant, and denies that Arnold advised the individual defendants concerning the Kevin-Sunburst field ''or any other place'' where it would be advisable to secure leases, or that they acted at any time upon knowledge received from Arnold. It is then alleged that early in 1920, J. E. Erickson, who was not in any way connected with the corporation, secured leases on 2,000 acres in the Blackfeet Indian Reservation and interested other Kalispell men therein, resulting in the organization of the syndicate, and thereafter, desiring to enlarge the membership, they invited Stannard, Lang, Carlson and others to join them; that Emmons had left Kalispell and was preparing to go to Missouri, when original members of this group requested Lang to solicit his services as geologist for the syndicate; and that it was pursuant to this arrangement that Emmons returned to Kalispell and later secured the leases in question.

All affirmative allegations of the answer were denied by replication. Issue being joined, Judge C. W. Pomeroy, of Kalispell, deeming himself disqualified, called in Judge George B. Winston, of the Third Judicial District, an able and experienced trial judge, who heard the testimony of over 40 witnesses, presented here by 760 pages of the printed record, and thereon made findings of fact fully covering the issues and in accordance with the allegations of the answer, closing with the finding of ''the issues herein in favor of the defendants and

against the plaintiffs." Judgment was entered in accordance with the findings and the court's conclusion of law that the action should be dismissed "on the merits." The appeal is from this judgment.

The specifications of error challenge each of the adverse findings, the conclusion of law, and the judgment as "not in accordance with the evidence or law."

The crux of plaintiffs' charge is that the directors and officers of the corporation fraudulently and in disregard of their duty acted upon advice, given them for the benefit, and secured at the expense, of the corporation, for their personal gain and should, in equity, be required to account to the corporation for the profits.

Granting that, if plaintiffs sustained their charges by a preponderance of the evidence, they should prevail, we are met, at every stage of the argument of counsel, by an adverse finding of the court, and the sole question here presented is as to the sufficiency of the evidence found in the voluminous record before us, to support those findings. In other words, before the rules of law and equity cited by plaintiffs can be applied, counsel for plaintiffs must show that the findings made are not supported by substantial evidence, and, in attempting to do so, they are faced by the well-established rules that this court enters upon a review of the evidence indulging the presumption that the judgment is correct and must draw from the evidence every legitimate inference to support that presumption and view the evidence in the light most favorable to the prevailing party, deeming every material fact established which the evidence tends to prove; that the decision of the trial court will not be reversed unless it is shown that the evidence strongly preponderates against it, and, if the evidence is conflicting but furnishes substantial ground for differing conclusions, the findings will not be disturbed. (*Baker* v. *Citizens' State Bank*, 81 Mont. 543, 264 Pac. 675.) These rules are particularly applicable here, since the learned trial judge, as the sole trier of fact conditions, heard the testimony and

observed the demeanor on the stand, of, apparently, all of the prominent business and professional men of Kalispell, the veracity and integrity of none of whom was impeached except in so far as the testimony of one would contradict that of another, thus presenting a conflict in the evidence to be determined by the trier of fact, on the result of his observation of the witnesses, applying his ability to judge human nature acquired by long experience on the bench.

In attempting to establish the crux of their charges, as outlined above, the plaintiffs were forced to rely upon purported declarations or admissions of the defendant directors, said to have been made at the time the subscription list was circulated in 1920, or eight years prior to the trial, and certain statements made in correspondence which passed between them and Arnold.

The testimony concerning the statements, said to have been made long prior to the time of trial, is of that class said to be regarded as weak and even dangerous evidence which should always be received with caution (*Hoppin* v. *Lang,* 81 Mont. 330, 263 Pac. 421), and the making of the statements attributed to them was denied by the defendants.

The correspondence had between Stannard, Lang, Emmons and Arnold was all introduced while Arnold was on the stand as a witness for the plaintiffs; therefrom, and from the oral testimony of Arnold, it is clear that the employment of Arnold, for which it was agreed that he should be paid $2,750 and for which he was in fact paid that sum, was to examine "the territory immediately surrounding the town of Kalispell, in the Flathead Valley," for the corporation, and the purpose of the employment is clearly expressed in the statement found in a letter from Stannard and Lang to Arnold that "some of the best men in the county are back of this movement and we want to settle the question whether or not there is any possibility of getting oil or gas in paying quantities in this valley."

Arnold made a four-day examination of the valley and reported orally that "the possibilities in the valley were very,

very remote" and departed; he did not make his written report, however, until July 18, 1920.

While certain of the original subscribers testified that the ▮ corporation proposed to seek oil leases outside the county if Arnold's report was adverse, others testified that the only purpose of organizing and raising money was to determine the possibilities of their home territory; some testifying that they regarded their subscriptions merely as "donations" for that purpose, and, learning that there was no prospect of finding oil at home, they lost interest. The corporation became dormant.

Counsel for plaintiffs contend that this testimony should be disregarded, as the purposes of the corporation were fixed by its articles of incorporation and cannot be limited by parol testimony, citing *City of Kalamazoo* v. *Kalamazoo Heat Co.,* 124 Mich. 74, 82 N. W. 811. There is no doubt of the correctness of the rule applied in that case, as there the city was attempting to prevent the defendant corporation from exercising powers granted by its certificate of incorporation, by introducing oral testimony to the effect that at the time of its organization the corporation intended only to drill for natural gas. Here the testimony, of which complaint is made, was as to what was actually done by the corporation under a grant of powers covering a wide range of activities, in any of which the corporation might have engaged. As between members of the corporation it was clearly proper to admit testimony as to which of the powers acquired the corporation intended to exercise and as to what it actually did with reference thereto.

The court's findings to the effect that the group to which ▮ plaintiffs belong intended only to ascertain whether or not oil existed in their home community, and that Arnold was employed by the corporation solely for the purpose of determining that question, are abundantly supported by substantial evidence and cannot be disturbed.

As proof of their assertion that the leases in question were secured as the result of acting upon advice and information

given by Arnold to the directors of the corporation, while Arnold was in Kalispell in the employment of the corporation, plaintiffs place great reliance upon a letter written by Arnold to Stannard on June 19, 1920, in which he said: "I am lending my assistance to Mr. Emmons partly to enable you and your associates to acquire something which will enable you to recoup the money expended in securing my report on the Kalispell area," and a similar statement made in a letter to Emmons. The "assistance" which Arnold was then rendering was, however, merely advice concerning lands lying north of Havre on both sides of the international boundary, and never developed into the securing of anything of value. Asked to explain this statement, Arnold replied: "I would answer it this way. That I had a great admiration for Mr. Emmons. I thought he would be very valuable in hunting out new oil lands, and I would be glad that if through the means of his employment some of these people here could recoup their loss." In his letter to Emmons, Arnold said: "Confirming my statement to you while in Kalispell, I would be glad to co-operate with you in regard to acquiring and development of prospective oil lands in northern Montana or elsewhere, with the understanding that you are to acquire leases on attractive property, which you would be willing to turn over to me or to some company which I would designate on terms which are to be mutually satisfactory to both of us." Arnold testified that this letter referred only to a prospective association with Emmons personally, and that he "had in mind no relation" with the corporation, and all of the testimony is to the effect that the only information imparted to Emmons, or to any one connected with the corporation, while Arnold was in Kalispell, or thereafter by letter, concerned "lands in northern Montana," north of Havre and near the international boundary. If it could be said that this proposed connection with Emmons was for the benefit of the corporation, as plaintiffs contend, and that Emmons acted upon it by securing leases in the territory mentioned, a trust might be declared in favor of the corporation

under the authorities cited by plaintiffs, but Emmons did not act upon this advice; instead, he went to Anaconda with the intention of going to Missouri to engage in the "oil game."

The manner in which he was induced to return to Kalispell, the genesis of the syndicate, the securing of information concerning the territory now known as the Kevin-Sunburst field, and the securing of the leases in question, are explained at length by witnesses for the defendants. Briefly summarized, this testimony is as follows: Practically at the same time as the group of Kalispell citizens who formed the corporation were interesting themselves, and spending their money, to discover whether or not oil existed in the home valley, a half dozen men of that town, among them the district judge, T. A. Thompson, and former judge, J. E. Erickson, now governor of Montana, became "hopped up over oil," as the governor expressed himself, and were not so particular as to where it was found; each contributed $500 toward a fund to be used in seeking a promising field for their endeavors. Judge Erickson secured leases on 2,000 acres of land on the Blackfeet Indian Reservation, and, on his return to Kalispell, the group deemed it advisable to increase their membership and thereupon invited Lang, Stannard, Carlson and others to come in on the same basis as the original associates.

Hearing of Arnold's estimate as to Emmons' ability and being familiar himself with the man's worth, Judge Erickson requested Lang to get in touch with Emmons and arrange, if possible, to secure his services as an oil scout for this group. Emmons was induced to accept the offer on being given a ten per cent "carried interest" in the enterprise, and expenses; on his return to Kalispell he was sent to examine the Blackfoot leases and, while doing so, learned of the activities of Gordon Campbell in what is now known as the Kevin-Sunburst field. Emmons abandoned the reservation and proceeded to secure the leases in question. He then wrote Arnold and, through his efforts, Arnold joined this group on the same basis as Emmons had been taken in. He then examined and approved the leases,

and in March, 1921, the syndicate was formed and the leases assigned to it; oil was produced and the leases became very valuable.

It is clear from the evidence, if the testimony of Arnold and all those connected with the syndicate is to be believed, that Arnold received his knowledge of the Kevin field from Emmons and had no information to impart at the time plaintiffs contend he advised Emmons to seek leases in this field.

Counsel for the plaintiffs contend that this positive testimony should be disregarded in favor of circumstances pointing out the devious trail of breach of trust, attempted to be hidden by oral testimony, which trail we should follow in the manner described by the poetical language used in *Merchants' Nat. Bank* v. *Greenhood*, 16 Mont. 395, 41 Pac. 250, 851. The trial court, however, gave full credit to the testimony and, thereon, found that the directors and Arnold acted in good faith, nor do we think, on the record, the contrary conclusion could have been reached in the face of the overwhelming evidence of good faith which the law presumes—it never presumes fraud. (*Cuckovich* v. *Buckovich*, 82 Mont. 1, 264 Pac. 930). This court cannot set itself up as a judge of the credibility of the witnesses who testify; that is the province of the trial court, and, it having spoken on apparently credible testimony, its findings cannot be disturbed.

The question, then, is as to whether the directors and officers of a corporation are prohibited from engaging in the same business as their corporation on penalty of being required to account for their profits to their corporation if they do so engage in business. This question must be answered in the negative.

Section 7892, Revised Codes of 1921, provides that "no trustee, so long as he remains in the trust, may undertake another trust adverse in its nature to the interest of his beneficiary in the subject of the trust, without the consent of the latter." And in *Kleinschmidt* v. *American Min. Co.*, 49 Mont. 7, 139 Pac. 785, following the thought contained in the statute,

but not citing it, this court said: "The directors are the agents and trustees of the stockholders, and they may be called to account for any misappropriation of property or funds in their hands, as such. * * * Even within the scope of their powers they may not so direct affairs as to gain an unfair advantage or profit for themselves. In either case their conduct is a violation of their trust, and is in law deemed a fraud upon the stockholders not assenting to it." To the same effect, see *Barker* v. *Montana Gold etc. Min. Co.,* 35 Mont. 351, 89 Pac. 66.

But neither the provisions of the statute nor the declarations found in the opinions cited go so far as to preclude a director from becoming interested in another concern engaged in a business similar to, but not interfering with, that of his company. "If acting in positive good faith to the corporation and his coshareholders, there seems to be no reason why he [a director] should be precluded from engaging in the building and operation of other distinct works in the same general business, nor any reason why, in respect to such works, he should be deemed to stand in any trust relation to the corporation; * * * true he owes to his stockholders the most scrupulous good faith. He may not deal with the trust property for his own advantage; he may not deal in his own behalf in respect to any matter involving his right and duties as a director; he may not seek his own profit at the expense of the company or its stockholders. But so long as he violates no legal or moral duty which he owes to the corporation or the stockholders, he is entirely free to engage in an independent competitive business." (2 Thompson on Corporation, 3d ed., 853, sec. 1350; 2 Cook on Corporations, 6th ed., 1948; *McDermott Min. Co.* v. *McDermott,* 27 Mont. 143, 69 Pac. 715; *Mayger* v. *St. Louis M. & M. Co.,* 68 Mont. 492, 219 Pac. 1102.)

In *Coleman* v. *Hanger,* 210 Ky. 309, 275 S. W. 784, relied upon by plaintiffs, the directors of a company organized a rival company and were held accountable as trustees of the old company; the court stating: "As directors of the old company the

defendants were trustees for its benefit. This would not preclude them from *bona fide* entering into other business of the same general nature; but they could not in good faith engage in a rival business to its detriment.'' In that case, however, the lack of good faith in the defendant directors is shown by the court's statement that ''it is clear that as individuals they acquired stock in the new company by virtue of their ownership of stock in the old company, and that the business of the new company was developed through the good will theretofore established by the old company and by their efforts while acting as directors of the latter company.'' ''Good faith to the corporation does not require of its officers that they steer from their own to the corporation's benefit enterprises or investments which, though capable of profit to the corporation, have in no way become subjects of their trust or duty.'' (*Lagarde* v. *Anniston Lime Co.*, 126 Ala. 496, 28 South. 199.)

Herein there is substantial evidence warranting the conclusion that, while these directors and officers were acting in absolute good faith towards their corporation and stockholders, they were offered an opportunity to join with another group intending to form a syndicate, also for the purpose of seeking profit from oil ventures, and that, without taking advantage of any knowledge gained in their fiduciary capacity, they accepted this offer.

While the leases in question were secured by an officer of the corporation, they were secured while serving the independent group and not the corporation. There is nothing in the law or in equity to prevent a man from going into as many ''wildcat'' oil ventures as his inclination, credulity, and finances will permit, so long as he does not betray any such one in which he has become a director or officer, to his own or another's profit. The record discloses that defendant Stannard had been instrumental in organizing fifteen to twenty such companies before he went into the syndicate, and the fact that a person is a director in one such corporation should raise no presumption, or even suspicion, of intended wrongdoing in

simultaneously aiding in the organization of a second company, in the days of oil excitement; one may be successful and thus recoup the losses of the other. Arnold evidently had such a situation in mind in writing the letters relied upon by plaintiffs; but in this instance the recoupment achieved by these men came, not through the assistance rendered or offered by Arnold, but through an independent venture launched by an independent group of men, and the knowledge gained by Emmons resulting in securing the leases in question belonged to the men who got him back to Kalispell and financed his activities in securing those leases; he could not have taken this knowledge and those leases to the corporation had he so desired.

But, plaintiffs contend, some portion of the funds of the corporation was employed in protecting the leases. This contention is in nowise supported by the evidence. The record discloses that, after paying Arnold for his services, something less than $600 remained in the treasury; of this amount all but $66 was duly invested by the corporation in a project in the Cat Creek field, and lost. As to the $66, units in the syndicate were selling at $40; instead of using this $66 as charged, the directors were enabled, by their association with the syndicate, to purchase two units therein for this sum, which units were held by the corporation until they reached a value of $2,000, when they were sold at the peak of unit prices and the money distributed to the stockholders. The trial court properly found that no breach of trust was committed in this regard.

There is evidence in the record to the effect that in organizing their $200,000 corporation the plaintiffs and other subscribers to stock intended to continue to contribute or to sell stock and seek oil leases wherever oil might be found, and that, had the officers called for more money with which to carry out the declared purposes of the corporation, it would have been forthcoming, and it is urged, in this regard, that the defendant officers and directors did not perform their full duty toward the corporation. This is not the issue joined, but even if properly

here for determination, we cannot say, in the light of the testimony showing a contrary intention on the part of the corporation, that the plaintiffs should have prevailed on this theory; the evidence does not "strongly preponderate against" the sweeping findings of good faith made by the court.

Finding no reversible error in the record, the judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.