GOLDEN ROD MINING CO., Respondent, *v.* BUKVICH
ET AL., Appellants.

(No. 7,834.)

(Submitted January 31, 1939.   Decided June 19, 1939.)

[92 Pac. (2d) 316.]

*Mr. T. J. Davis,* for Appellants, submitted a brief, and argued the cause orally.

*Mr. Robert H. Allen,* and *Mr. Fred B. Morrill,* the latter of the Bar of Spokane, Washington, for Respondent, submitted a brief, and argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Plaintiff Golden Rod Mining Company, a Montana corporation, brought action in the district court of Madison county against the appellants Sam J. Bukvich, John Bukvich and Don Komad, and was awarded a decree adjudging that the defendants held four unpatented lode mining claims in trust for plaintiff, and requiring them to convey the claims to it. All three defendants have appealed.

The complaint alleges that plaintiff corporation was organized on June 29, 1933, acquired its mining property on August 4, 1933, and commenced its mining operations about December 1, 1933; that the defendant Sam J. Bukvich was one of the incorporators and directors and continued to hold office for over fifteen months; that on July 10, September 19 and October 2, 1933, respectively, he located the Mary Ann, Montana Girl and Montana lode mining claims, and that on September 20, 1934, the three defendants located the Montana Boy claim, which covered the same ground as the Montana Girl claim; that the first three claims overlapped and adjoined certain of plaintiff's claims and were necessary for the development and operation of plaintiff's mining property; that upon plaintiff's incorporation, and at all times thereafter, it was the intention of plaintiff's incorporators, directors and stockholders to locate the ground in question for plaintiff, and that upon taking steps to locate the ground,

plaintiff first learned of defendants' locations; that the defendant Sam J. Bukvich was a stockholder and director in the Golden Gate Mining Company, which formerly was interested in and operated the same property; that he was familiar with the project and knew that the ground located by him was necessary to it and that plaintiff intended to locate the same. The only allegations tending to connect the other two defendants, John Bukvich and Don Komad, with the matter was that they were the son and nephew, respectively, of Sam J. Bukvich, that all three located the Montana Boy claim, and that the latter covered the same ground as the Montana Girl claim. Sam J. Bukvich, the principal defendant, will hereinafter usually be referred to simply as Bukvich.

The defendants' joint general and special demurrer was overruled, whereupon they filed an answer putting most of the material facts in issue, and pleading as a further defense that Bukvich attended no directors' meetings, had no personal knowledge of the company's business, and did not participate in its affairs in any way, except to sign the minutes, which were sent him for the purpose; that A. F. Bingenheimer organized and promoted the company, and with his daughter, Helen Bingenheimer, and his son-in-law, Roy H. Armstrong, comprised a majority of the directors and conducted the company's affairs; that it was agreed between them that Bukvich was to be named as a "dummy" director, but should have no actual participation in the company's affairs, which were to be conducted in the state of Washington by the said majority members, and that he could proceed to locate and operate claims and otherwise continue in the mining business, and that any mining claims and deals, and the profits therefrom, should be his private property; that the plaintiff had full knowledge of the agreement; that pursuant to that agreement Bingenheimer attempted on behalf of plaintiff company to buy the Montana, Montana Girl and Mary Ann claims from Bukvich, and to purchase "an easement or right of way under and over the ground to make the access to the property of the plaintiff corporation less expensive and less difficult to the workers of the plaintiff corporation; that said negotia-

tions were not completed because the said plaintiff corporation refused to pay the price demanded by the said Sam J. Bukvich for said mining claims herein mentioned and for the easement over and under said claims.''

In its reply plaintiff admitted the above allegations, except those relative to the alleged agreements that Bukvich was to be only a dummy director and was to be free to locate mining claims, etc. The record includes no evidence of such agreements.

Trial was to the court without a jury, after the denial of defendants' joint motion for a jury trial and overruling of their joint objections that the complaint failed to state a cause of action.

The record is not very voluminous. The undisputed facts are that Bukvich, Anderson, Thomas and others were interested in an earlier corporation named Golden *Gate* Mining Company, which had attempted to promote and develop the Iron Rod group of eight patented and seven unpatented lode mining claims; that Anderson and Thomas had interested Bingenheimer in the proposition, and that he had made an initial $500 purchase of stock and continued to furnish further money until he became dissatisfied with the management. He then refused to cooperate further in the old company, but proposed instead to organize plaintiff corporation to take over the mining project under his control, and to issue stock share for share to the stockholders of the old company. His plan was accepted by all, including Bukvich, and plaintiff company was organized with one million shares of 10 cents par value, as against the old company's capitalization of one-half million shares of $1 par value. Anderson made the objection that by the exchange his stock holdings would be cut down ninety per cent. because each new share represented only one-tenth of the par value of the old; but it is apparent that each new share represents one-half as large an interest in the property and project as each old share; at any rate, all the stockholders, including Anderson, apparently accepted the new stock, and, so far as appears from the record, all creditors were paid and no one has attacked the good faith of the transaction.

Bukvich received 15,000 shares in the exchange, and an additional 5,000 for inducing Anderson to agree to it.

The plaintiff company was organized, as stated above, on June 29, 1933, Bukvich being one of the incorporators and directors and fully informed of its purposes. On August 4, 1933, it obtained the necessary leases and options, and about December 1, 1933, commenced mining operations. Meantime, on July 10, eleven days after plaintiff's incorporation, and before its negotiation for the leases and options had been completed, Bukvich located the Mary Ann lode claim; and on September 19 and October 2, before plaintiff had commenced mining operations, he located the Montana Girl and Montana lode claims. It was not until September 20, 1934, about one year later, that the fourth lode, the Montana Boy, was located by all three defendants.

It is clear that the Mary Ann claim is reasonably necessary for plaintiff's enterprise. It adjoins plaintiff's Golden Rod claim, is situated between 200 and 600 feet from the mouth of the plaintiff's tunnel, down a sixty-degree slope, so that plaintiff's dump of waste rock has already reached its border. While defendants' witnesses testified that by turning its tracks and running farther, plaintiff could dump elsewhere, plaintiff's witnesses testified without contradiction that "it would be a very short while until we would be shut off for dump ground." The Montana Girl claim occupies a fraction between plaintiff's Argalia and Bull Dog claims, and in direct line with its tunnel to reach the Argalia, and will interfere with its operations and may also raise apex questions. The Montana claim covers two fractions near the Iron Rod claim, and Bukvich apparently claims great value for it on the theory that the lead runs out of the Iron Rod and into the Montana, so that he owns half of the apex; in March and October, 1935, he notified plaintiff that it was taking his ore, and directed them to desist. His final demand for these three claims, two of them fractional ones, was $45,000, although the total cost of the fifteen claims (eight of them patented) making up the Iron Rod group was $50,000. It seems apparent that his sole purpose in locating these fractions in the Iron Rod group and the Mary Ann claim below plain-

tiff's tunnel mouth was to gain a hold upon the Iron Rod group and plaintiff's project. They were not connected and not of sufficient extent to form the basis for an independent mining operation.

As to the first three claims the sole question was whether he was in a position to locate them for the above purpose, while he was a director of the company and before the company commenced operations. The question is not whether he could locate claims or engage in the mining business, but whether he could, without warning the company, locate claims which he considered within the scope of the development and operation of its property. He testified that he asked Bingenheimer and Thomas why they did not locate the ground, but not that he gave warning that he would locate it if they did not; it is clear that he considered the ground in question highly desirable, if not indeed actually necessary, for the plaintiff's mining operations.

The defendants contend that he had that right because he was merely a dummy director; however, there is only one variety of director known to business corporations organized in Montana. Directors have definite duties and responsibilities. In common parlance, a dummy director is one who is a mere figurehead and in fact discharges no duties. However, we know of no principle of law under which his wrong to the corporation and its stockholders in retaining an office and thus keeping it from being properly filled but in failing to discharge its duties, releases him from the fiduciary responsibilities of his office, so as to permit him to wrong the stockholders further by interfering with the corporation's project and doubling the cost of its property. The question is one of equity, and even if he had a right to retain an office without performing its duties, that fact did not confer upon him the further right to violate his trust. Assuming, for the moment, that he had no duty to act for the corporation, still he had the duty not to act against it, and certainly not to act against it without prior warning so that it might protect itself and its stockholders.

If the corporation is to survive as a form of business organization, a higher standard of morality than that must be

576

exacted of those to whom its stockholders' interests are entrusted. Granting that a director may engage in a rival business and may, under proper conditions, enter into competition or have dealings with his corporation, still he may not, without breach of his trust, interfere directly with its business or project. Bukvich was not merely dealing with his company, entering into competition with it, or engaging in a rival business. He was interfering directly with its project, and demanding $45,000 as the price of discontinuing his interference.

It seems clear that the right of a director to engage in enterprises of the same nature does not entitle him to enter into transactions of such a nature as to cripple or injure the company's business, or hinder or defeat it. (*Morris* v. *Hussong Dyeing Machine Co.*, 81 N. J. Eq. 256, 86 Atl. 1026; *Zeckendorf* v. *Steinfeld*, 12 Ariz. 245, 100 Pac. 784.) He cannot, therefore, be allowed to profit personally by acquiring property which he knows the corporation will need or intends to acquire. (*Tierney* v. *United Pocahontas Coal Co.*, 85 W. Va. 545, 102 S. E. 249; *Gilmore* v. *W. J. Gilmore Drug Co.*, 279 Pa. 193, 123 Atl. 730; *New York Trust Co.* v. *American Realty Co.*, 244 N. Y. 209, 155 N. E. 102.)

Clearly, the personal interest of a director must not be antagonistic to that of the corporation. (2 Thompson on Corporations, 3d ed., sec. 1321.) The Supreme Court of the United States said with reference to this point that the general rule rests "upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity." (*Michoud* v. *Girod*, 4 How. 503, 555, 11 L. Ed. 1076.) And where a director's personal interests become antagonistic to those of the corporation, it is his duty to resign. (*Covington & L. R. Co.* v. *Bowler's Heirs*, 9 Bush, (Ky.) 468.) But this Bukvich refused to do while obviously pursuing his own antagonistic interests.

While not strictly a trustee, it is well settled that a director occupies a fiduciary relation to the company and its stockholders. (*Hanson Sheep Co.* v. *Farmers' & Traders' State Bank*, 53 Mont. 324, 163 Pac. 1151; *Duffy* v. *Hastings*, 78 Mont. 22,

252 Pac. 316.) His acts must therefore be for the benefit of the corporation and its stockholders and not of himself (*Coombs* v. *Barker*, 31 Mont. 526, 79 Pac. 1), and he will not be permitted to enrich himself at their expense. (*Mayger* v. *St. Louis Min. & Mill. Co.*, 68 Mont. 492, 219 Pac. 1102.)

It is not that defendant profited by his trust in the sense of gaining by improper dealings with it, or of misappropriating its assets; but that he acted for his own benefit and not that of the company within the scope of its enterprise. He gained for himself something upon which he placed a high value solely upon the ground that it was highly desirable, if not absolutely necessary, for plaintiff's enterprise. Directors may not so act as to gain an unfair advantage or profit for themselves. Such conduct is a violation of their trust, and in law is deemed a fraud upon the corporation and its stockholders. (*McConnell* v. *Combination M. & M. Co.*, 31 Mont. 563, 79 Pac. 248; *Kleinschmidt* v. *American Mining Co., Ltd.*, 49 Mont. 7, 139 Pac. 785.)

By section 7887, Revised Codes, a constructive trust is declared. (*Meagher* v. *Harrington*, 78 Mont. 457, 254 Pac. 432.) That section reads as follows: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other or better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." By the violation of his trust duty to advance and not to impede plaintiff's enterprise, Bukvich brought himself within the terms of the statute.

Plaintiff's evidence showed that the first three claims were located by defendant Bukvich before plaintiff commenced mining operations and before it had money available to make the location itself. Defendant, on the other hand, questioned plaintiff's reason for not locating the ground, for the reason that the cost was trivial. It is apparent, therefore, that practically the entire price for which defendant may be able to sell the claims would constitute profit to him arising out of his breach of duty to further the company's interests within the scope of its enterprise,

rather than to further his own interests so far as they conflicted therewith.

None of the cases cited by counsel or referred to herein are exact precedents under the facts; but the principles involved are the same. Obviously he should not, while a director, actively interfere with the corporation's projected enterprise so as to increase the cost of its capital expenditure in connection therewith, and to enrich himself at the stockholders' expense.

As to the Mary Ann, Montana, and Montana Girl claims the complaint clearly stated a cause of action, and the judgment of the district court must be affirmed, since there is ample evidence to sustain it.

The same thing is true as to Bukvich's interest in the Montana Boy claim. It and the Montana Girl claim together apparently cover the fraction between the plaintiff's Argalia and Bull Dog claims, so as to be reasonably necessary and valuable to plaintiff's project. Clearly, plaintiff's workings between the Argalia and Bull Dog claims must go through either the Montana Boy or the Montana Girl claim, or both, and either may form the basis for apex litigation. It is not clear how the fraction covered by these claims could be valuable except by reason of these conditions. The only difference is that the Montana Boy claim was located on September 20, 1934, long after the other three, and nearly a year after plaintiff had discovered Bukvich's antagonistic activities. It would seem that, after its discovery of the situation, the plaintiff should have taken steps to prevent further breaches of faith on his part. However, it apparently thought that he had already appropriated all open fractions, and contended in its pleadings and evidence that the two claims covered the same ground. In any event, the discovery that one in somewhat of a trust relationship has violated his trust cannot be said to justify his further violations as between him and the corporation and stockholders he represents. As to his undivided one-half interest in the Montana Boy claim the situation is the same as in the case of the other three claims, and the judgment must be affirmed.

As to the undivided one-fourth interest of each of the other ▮ two defendants, John Bukvich and Don Komad, in the Montana Boy claim, the situation is otherwise. Neither stood in a fiduciary relationship to plaintiff company; neither is alleged or proven to have been involved with Bukvich in a conspiracy to injure plaintiff; only conjecture arising from their relationship and association can give any such suspicion, and it is utterly insufficient to sustain the judgment as against them.

Appellants attack plaintiff's right to institute and maintain ▮ this action, and the sufficiency of the evidence to sustain the judgment, upon the ground that the first meeting of stockholders was not held in the state of Montana as required by statute, and that it therefore has no legal existence.

It is not necessary to consider here the right of one to question the existence of a corporation of which he was an incorporator and director and with which he has sought to deal, although the query naturally suggests itself whether a director's obligations and duties to his corporation come within the contemplation of section 5998, Revised Codes, which provides: "One who assumes an obligation to an ostensible corporation, as such, cannot resist the obligation on the ground that there was in fact no such corporation until that fact has been adjudged in a direct proceeding for the purpose." (*W. T. Rawleigh Co.* v. *Miller,* 105 Mont. 456, 73 Pac. (2d) 552.)

Section 5908, Revised Codes, sets forth the procedure for organizing business corporations, and the holding of a stockholders' meeting is not one of the requirements. Nor does the failure to hold such meetings within Montana constitute, under section 6010, an automatic dissolution of the corporation, without reference to the question whether it would justify a direct proceeding for dissolution. The objection is therefore not tenable.

It is further contended that the court erred in trying the case ▮▮ without a jury, for the reason that questions of fact as well as of law were involved. If the contention were valid, no equity action could be tried without a jury if any question of fact were presented. Such is not the law. It is well settled that the constitutional right to trial by jury must be construed

in light of the conditions existing at the time of the Constitution's adoption, and is the right as it then existed, and not one created or extended, except as expressly provided, by the instrument itself. (*State ex rel. Jackson* v. *Kennie*, 24 Mont. 45, 60 Pac. 589; *Montana Ore Purchasing Co.* v. *Boston & Mont. C. C. & S. M. Co.*, 27 Mont. 288, 70 Pac. 1114; *Chessman* v. *Hale*, 31 Mont. 577, 79 Pac. 254, 3 Ann. Cas. 1038, 68 L. R. A. 410; *Consolidated Gold & Sapphire Min. Co.* v. *Struthers*, 41 Mont. 565, 111 Pac. 152; *Cunningham* v. *Northwestern Imp. Co.*, 44 Mont. 180, 119 Pac. 554; *In re Valley Center Drain Dist.*, 64 Mont. 545, 211 Pac. 218; *Bull* v. *Butte Elec. R. Co.*, 69 Mont. 529, 223 Pac. 514.)

This is clearly a suit to decree and enforce a trust, and is within what always has been the exclusive equity jurisdiction. Like other cases within the equity or chancery jurisdiction when the Constitution was adopted, it is not one to which the right of trial by jury attaches. (See *Finch* v. *Kent*, 24 Mont. 268, 61 Pac. 653; *Davidson* v. *Davidson*, 52 Mont. 441, 158 Pac. 680.) The submission of issues to a jury in an equity case is purely within the discretion of the trial court, and the latter may reject its findings in whole or in part. (*Yellowstone Nat. Bank* v. *McCullough*, 51 Mont. 590, 154 Pac. 919.) No error was committed by the court in hearing the cause without a jury.

The judgment is affirmed as to Sam J. Bukvich and reversed as to John Bukvich and Don Komad.

ASSOCIATE JUSTICES STEWART, ANGSTMAN and ERICKSON concur.

MR. JUSTICE MORRIS:

I dissent. The majority opinion is an able exposition of the general rule relating to the obligation of a director to his corporation, but the majority fails to recognize what I regard as a vital difference between the obligation of an active director and one, a mere dummy, who has no part whatsoever in the management of the corporate affairs. Bukvich, of course, should have resigned, but his resignation would have had

no effect on the affairs of the corporation about which he was never consulted. He never attended a meeting of the stockholders or directors. The record does not show that he was even advised of the dates meetings were to be held. The fact that he did not resign from a directorate wherein he exercised no power is not sufficient, in my judgment, to deny him the right to acquire a part of the public domain open to anyone who may choose to comply with the requirements incident to its acquisition. The majority opinion reverses the judgment of the district court as to the interest of Sam J. Bukvich's two associates in the Montana Boy claim. As a clear matter of fact, Sam J. Bukvich exercised no more power in the affairs of the plaintiff than his co-defendants. As the factual situation here is so vitally different from that in any similar case heretofore determined in this jurisdiction, I am impelled to analyze and compare adjudicated cases with the action at bar.

The case of *Gerry* v. *Bismarck Bank,* 19 Mont. 191, 47 Pac. 810, 812, plaintiff contends ''is directly in point.'' Such contention is not sustained by that case. Plaintiff fails (1) to differentiate between an act of a director or officer of a corporation who enriches himself out of the corporate property at the expense and to the injury of the corporation, and the director or officer who buys for himself out of his own funds property that is open or for sale to the first comer; and (2) there is another vital difference between the *Bismarck Bank Case* and the case at bar, in that in that case the corporation was injured and suffered loss by the acts of two of its officials who directed and controlled its affairs, while here an inactive or ''dummy'' director holding a comparatively small amount of stock in the corporation and having no part whatever in its control or management acquired property by his own efforts and at his own expense which that corporation had ample opportunity to acquire but slept on its opportunity.

In the *Bismarck Bank Case,* which is typical of nearly all the cases cited to support plaintiff's contention on the question of Bukvich's violation of trust, the president and treasurer of the corporation ''were the directors and officers who superintended

and directed the operations of the corporation." The president acquired title to a claim referred to as the "Valley" claim, an unpatented piece of ground but which adjoined the "Tecumseh," a patented claim owned by the corporation and from which ores had been extracted which resulted in dividends being paid to stockholders in the sum of $66,000. The president paid $45,000 for the Valley claim and he then took the treasurer into his confidence and the two, at the expense of the corporation, went to Boston to confer with other stockholders and represented to the Boston stockholders that the president had bought the Valley claim for $95,000; that it was worth $110,000, and induced the Boston stockholders to approve its purchase at that figure, and join in authorizing a mortgage on the two claims of the corporation to the Bismarck Bank to pay for the Valley claim. The Boston stockholders agreed and on their return to Montana the president and treasurer had the stockholders approve the purchase and the mortgage to the Bismarck Bank, and the stock controlled by the two was voted in favor of both the purchase and the mortgage and such stock was necessary in order to obtain the approval of a two-thirds majority of the whole number which was necessary to authorize the mortgage. The president and treasurer allowed the corporation to default in its obligation to the Bismarck Bank, and it became apparent to other stockholders that the two conspirators intended to acquire the title to the mining property, and a suit was begun under the title mentioned which resulted in the exposure of the president and treasurer for fraud and deceit. That case is a clear case of officials in a controlling position in the corporation using its assets to enrich themselves at the loss and injury of the corporation, and has no application here, where a dummy director located open ground belonging to the federal government and no corporate assets were involved in the alleged fraud.

A number of other cases are cited by the plaintiff in support of its contention that Bukvich violated his trust as a director of the plaintiff corporation, and among such cases are: *Coombs* v. *Barker*, 31 Mont. 526, 79 Pac. 1; *Stanton* v. *Occidental Life Ins. Co.*, 81 Mont. 44, 261 Pac. 620; *Mayger* v. *St. Louis M. & M. Co.*,

68 Mont. 492, 501, 219 Pac. 1102; *McConnell* v. *Combination M. & M. Co.,* 31 Mont. 563, 79 Pac. 248; *Hanson Sheep Co.* v. *Farmers & Traders' State Bank,* 53 Mont. 324, 163 Pac. 1151; *Kleinschmidt* v. *American Min. Co., Ltd.,* 49 Mont. 7, 139 Pac. 785. In each of these cases, as well as all the cases from other jurisdictions I have been able to find the facts show that the official or director charged with violating his trust was in a controlling or dominating position in the supervision or management of the corporation's affairs, and that all dealt with the property of the corporation to enrich themselves and not with property belonging to a third person.

The plaintiff further cites section 1889 of 14A C. J., at p. 121, as follows: "A director or managing officer is precluded by his position from acquiring any interest in property adverse to that of the corporation. Where he does so he will be deemed *to hold as trustee* for the corporation and the stockholders, or he may be held liable for the loss to the corporation resulting from his breach of duty. He cannot dispute the title or possession of the corporation." Numerous cases are cited to support this text, among which are *McCourt* v. *Singers-Bigger,* (8 Cir.) 145 Fed. 103, 7 Ann. Cas. 287, and *Du Pont* v. *Du Pont,* (D. C.) 242 Fed. 98. Also among the number is *Coombs* v. *Barker* heretofore referred to. All the other cases cited to support the text are of similar import. The *McCourt* v. *Singers-Bigger Case* involved two very prosperous theater establishments in the city of Denver which were under the exclusive control and management of the president and one other director. This last-mentioned director was a representative of one of the principal stockholders of the corporation, a resident of London, England. The president and this director connived together and allowed some valuable leases on the places where the theaters were operated to lapse, incorporated a new company and took the leases in the name of the new company in which the two had a controlling interest, and this led to the litigation in that action.

The *Du Pont Case* is quite familiar to both bench and bar in nearly all jurisdictions. The head of that firm, being in poor health, took a long leave of absence and about the time of his

departure he proposed to sell a large block of his stock to the company which, he provided, should be resold at the same price to particular employees, whose services the president believed to have been of great value to the corporation. The finance committee of the corporation, under the leadership of the vice-president, who at the time was exercising the functions of president, considered the price of $160 a share fixed on the stock by the president that he proposed to sell to the corporation, to be too high, and made a counterproposal of $125 per share. On such offer being transmitted to the president through the mails, he rejected the counterproposal and withdrew the offer of sale. The vice-president continued to negotiate with the president for the purchase of his stock, organized a new company and offered the president $200 a share for his stock, which was accepted. It developed at the trial that the vice-president, by reason of his position as head of the corporation, in the absence of the president had gained knowledge relative to immense orders to be filled for powder and other explosives, of which the company was the principal manufacturer in this country, to be sold to foreign nations in the year 1915 during the World War, and such sales it was well realized would greatly enhance the value of the stock, and all of this information was suppressed by the active head of the concern when the negotiations were being carried on for the purchase of the stock of the president. These matters all came out at the trial, and the court held that the purchasers of the stock under such circumstances were held to be trustees for the other stockholders and interested parties who had been defrauded.

In all these cases, the facts are similar to those in the Montana cases which we have heretofore analyzed, namely, *officers or directors in positions of control and authority had used the corporate assets for their own enrichment at the expense and loss of other interested parties.*

The rule prescribing the limitations of a director's powers and his obligations to his corporation is clearly and correctly laid down in *Hanson Sheep Co.* v. *Farmers & Traders' Bank,* supra, where this court, speaking through Chief Justice Brantly, said

(53 Mont. 324, 163 Pac. 1154) : "Of course, the president of a corporation has no authority to *appropriate the assets of the corporation to his own use.* He and the other members of the board of directors cannot use their position for the purpose of enriching themselves at the expense of the other stockholders. They occupy a fiduciary relation to the stockholders. This imposes upon them the obligation to serve the purpose of their trust with fidelity, and forbids the doing of any act by them, or any one of them, by which the *assets of the corporation are diverted* to any use other than such as will serve the purpose of its organization. And when it appears that any one of them has been dealing with the corporation, the burden is at once upon him to show that his dealings have been fair and honest. (*Gerry* v. *Bismarck Bank,* 19 Mont. 191, 47 Pac. 810; *McConnell* v. *Combination M. & M. Co.,* 31 Mont. 563, 79 Pac. 248; *Coombs* v. *Barker,* 31 Mont. 526, 79 Pac. 1; *Kleinschmidt* v. *American Min. Co., Ltd.,* 49 Mont. 7, 139 Pac. 785.)"

In all these cases the delinquent director or officer charged with violation of his trust is shown to have been one who dealt with *corporate property* to the corporation's loss and to his gain, and they do not apply to the situation such as that before us for the reasons stated. I have been unable to find in this or any other jurisdiction any well reasoned decision which holds directly, or by reasonable conclusion, that an inactive director, such as Bukvich was in the plaintiff corporation, is prohibited from acquiring property in the ordinary course of business from a third party whether it was desired by or was of value to his corporation or not.

No by-laws of the corporation or resolution of the board of directors is cited to show any power was ever vested in Bukvich, or any duty imposed upon him to acquire any property or perform any act for or on behalf of the corporation. Such being the situation, the rule laid down in the following cases I think applies: *Colorado & Utah Coal Co.* v. *Harris,* 97 Colo. 309, 49 Pac. (2d) 429; *Carper* v. *Frost Oil Co.,* 72 Colo. 345, 211 Pac. 370; *Bisbee* v. *Midland Linseed Products Co.,* (8 Cir.) 19 Fed. (2d) 24; *Backus* v. *Finkelstein,* (D. C.) 23 Fed. (2d) 357; see,

also, *Pioneer Oil & Gas Co.* v. *Anderson*, 168 Miss. 334, 151 So. 161; *Anderson* v. *Dunnegan*, 217 Iowa, 672, 250 N. W. 115; *Greer* v. *Stannard*, 85 Mont. 78, 277 Pac. 622, 64 A. L. R. 772.

In the *Colorado & Utah Coal Co. Case*, supra, it was said: "Harris, as such representative, could embark upon no business which would cripple or injure his principal or acquire interests adverse to it if thereby he would hinder or defeat the very purpose of its organization. But, *if he had no duty to act or contract for it with respect to the property in question*, he was at liberty to act for himself." (Italics supplied.) Harris was the president of the corporation and acquired 160 acres of coal land in a mining district where his corporation owned a large amount of acreage carrying coal deposits. It was further said in that case: "Plaintiff seeks to establish a trust in which the alleged fraud of Harris, actual or constructive, is an essential element. Evidence thereof must be 'clear,' 'convincing,' 'certain,' 'unequivocal,' 'trustworthy,' 'conclusive.'" (Citing a number of cases.)

In the *Backus* v. *Finkelstein Case*, supra, it was said: "The stockholders of a corporation, as such, cannot participate in shaping its policies or directing its activities from day to day. They are obliged to look to and rely upon the managing officers, who in theory of law, and as a matter of fact, represent and act for all the stockholders. *Officers of a corporation, who through the ownership of a majority of the stock control its activities*, occupy a fiduciary relation to the minority stockholders, and at their peril must act in the strictest good faith in guarding the interests of the latter." (Italics supplied.)

It was said in *Bisbee* v. *Midland Linseed Products Co.*, supra (19 Fed. (2d) 28): "There might arise a situation in the affairs of a corporation which would impose a specific duty upon those in control of the corporation to deal in the stock on behalf of the corporation. The rule is stated as follows in Fletcher, Cyc. Corp., § 2282: 'The test seems to be *whether there was a specific duty on the officers sought to be held liable to act or*

*contract in regard to the particular matter as the representatives of the corporation, all of which is largely a question of fact. If there is no such duty, then the directors, or other corporate officer, may acquire outside interests, although the corporation may be more or less interested.'* [Italics supplied.] Instances may be imagined where this duty would arise. It would undoubtedly be a breach of duty for an officer to buy stock for himself, when he had been employed by the corporation to buy it for the corporation.''

These cases make a clear distinction between officers and directors who have certain specific duties to perform, and those who, like Bukvich, had no voice in the corporation's management or control.

Another reason why I think the decision of the lower court should be reversed is that, if the plaintiff desires additional ground for dumping its tailings—and that was one of the reasons set forth in its pleadings for asking a decree compelling Bukvich to convey the claims to the plaintiff—it has a clear and specific remedy provided by section 9934, Revised Codes, under the power of eminent domain.

Rehearing denied July 14, 1939.