JACOB BLAUSTEIN and Others, as Executors, etc., of LOUIS BLAUSTEIN, Deceased, and Others, Respondents, Appellants, and FRED C. HAAS and BEATRICE P. BARRY, Intervenors, Respondents, Appellants, v. PAN AMERICAN PETROLEUM & TRANSPORT COMPANY, Respondent, and STANDARD OIL COMPANY (INDIANA) and Others, Appellants, Respondents, and STANDARD OIL COMPANY (N. J.) and Others, Defendants.*

First Department, December 19, 1941.

---

*Allen T. Klots* of counsel [*Henry L. Stimson, Charles P. Noyes* and *Willis L. M. Reese* with him on the brief; *Winthrop, Stimson, Putnam & Roberts,* attorneys], for the plaintiffs, respondents, appellants.

*Ralph S. Harris* of counsel [*John R. McCullough, Frederick W. P. Lorenzen, Wyllys S. Newcomb* and *John A. Wells* with him on the brief; *Dwight, Harris, Koegel & Caskey,* attorneys], for the appellant, respondent, Standard Oil Company (Indiana).

*J. Howard Carter* of counsel [*George T. Townley, Stuart N. Updike* and *James E. Denning* with him on the brief; *Townley, Updike & Carter,* attorneys], for the appellants, respondents, Edward G. Seubert, Charles J. Barkdull, Louis L. Stephens, Emmet G. McKeever, James A. Carroll, Jr., and Robert E. Wilson.

DORE, J. In this stockholders' derivative action, these are cross-appeals from portions of a judgment entered after trial at Special Term. Defendants appeal from the parts of the judgment directing them to account and granting injunctive relief in plaintiffs' favor. Plaintiffs cross-appeal solely on the ground that additional and more drastic injunctive relief was denied; plaintiffs' appeal from other parts of the judgment has been withdrawn.

The suit was instituted by plaintiffs Louis Blaustein and Jacob Blaustein derivatively as officers and directors of Pan American Petroleum & Transport Company, and by all Blaustein plaintiffs as large minority stockholders of Pan Am, plaintiffs together owning 901,914, about twenty per cent, of the 4,702,945 shares issued. Louis Blaustein died after commencement of the action, and his executors were substituted as plaintiffs. Defendants Jackson and Bullock were not served. Defendant Standard Oil Company (Indiana) is a majority stockholder of Pan Am owning at the time of trial 78.64% of its stock. Two other stockholders are plaintiffs-intervenors.

The gist of the charges litigated on appeal is that Standard Oil Company (Indiana) as majority stockholder of Pan American Petroleum, acting through its nominees on the board of directors, dominated Pan American and in breach of claimed fiduciary duties exploited Pan American's corporate opportunities for Indiana's profit. The trial lasted over five months; the record on appeal consists of thirty-three printed volumes of nearly 15,000 pages; the briefs on appeal total 1,400 pages; the learned trial court wrote a comprehensive opinion including also his decision, findings of fact and conclusions of law being waived. If we are to keep within the reasonable limits of a judicial opinion, only facts essential to a disposal of the issues on appeal may be stated.

The complaint was considered by this court on a prior appeal from an order entered on a motion to strike out certain matters (251 App. Div. 704).

### INTRODUCTION.

To understand the issues presented, a preliminary statement of the factual genesis of the litigation is required. For brevity we will refer to the individual and corporate plaintiffs as "the Blausteins;" to Standard Oil Company (Indiana) as "Indiana;" to Standard Oil Company (N. J.) as "New Jersey;" to Pan Ameri-

can Petroleum & Transport Company as " Pan Am; " to Stanolind
Crude Oil Purchasing Company, wholly owned subsidiary of Indiana,
as " S. C. O. P.; " to Stanolind Pipe Line Company, wholly owned
subsidiary of Indiana, as " S. P. L.; " to Stanolind Oil & Gas Com-
pany, majority owned subsidiary of Indiana, as " S. O. & G.; "
to Humble Pipe Line Company, wholly owned subsidiary of Humble
Oil & Refining Company, a subsidiary of New Jersey, as " H. P. L.; "
to The American Oil Company (all of whose stock was originally
owned by the Blausteins, of which Pan Am acquired fifty per cent
in 1923 and the balance in 1933) as " Amoco; " to Lord Balitmore
Filling Stations, Inc., wholly owned subsidiary of Amoco, as " Balti-
more." A chart in the trial court's decision and opinion (174
Misc. 601, at p. 606) indicates the relationship between the cor-
porations involved.

Prior to 1923 Louis and Jacob Blaustein were engaged in the
successful marketing of gasoline products largely in the Middle
Atlantic States. In 1922 they incorporated under the names of
Amoco and Baltimore. In 1923 they sold one-half of the stock
of their two corporations to Pan Am which through a subsidiary
guaranteed all Amoco's and Baltimore's gasoline requirements for
ten years ending December 31, 1933, at five and one-quarter cents
under the local market price. This contract is referred to as
" the umbrella contract." Integrated with Pan Am's contractual
arrangements, Amoco and Baltimore continued to prosper. The
Blausteins in the 1923 contract acquired no Pan Am stock.
Between 1925 and 1929 Indiana acquired ninety-six per cent of
Pan Am's stock.

Pan Am was organized in 1915. Its main sources of supply
were petroleum products imported from Mexico and Venezuela;
it had its largest refinery in Aruba, Dutch West Indies, and also
a tanker fleet. Pan Am had not successfully developed foreign
markets but New Jersey had. In 1930 American producers were
strongly urging a Federal embargo or prohibitive tariff on imported
petroleum. Because of this state of facts, in April, 1932, the
" Sea View contract " (so called from the place of its making) was
entered into between Pan Am and New Jersey. Pan Am in effect
sold all its foreign petroleum producing properties to New
Jersey for $50,000,000 cash and seven per cent of New Jersey's
stock, and New Jersey agreed to supply Pan Am's gasoline require-
ments to December 31, 1933, the end of the umbrella contract.

The Blausteins charged that this transaction and certain alleged
secret options in connection therewith to purchase Pan Am's
domestic retail marketing facilities were part of a conspiracy
between Indiana, New Jersey and others against Pan Am. Sub-

sequent events, however, proved the wisdom, the business necessity and good judgment of the Sea View contract for Pan Am. Shortly after its consummation, Congress did impose a tariff effective June, 1932, on gasoline, crude oil and heavy oil which effectively stopped foreign crude and gasoline importations. Through the Sea View contract Pan Am's stockholders were advantageously enabled to sell before the embargo their interest in the foreign properties which would have become useless without foreign markets after the prohibitive tariff; and Pan Am was assured of a supply of refined products to meet its marketing requirements until other arrangements could be made.

In April, 1932, in connection with the proposed sale of Pan Am's foreign properties to New Jersey, the Blausteins purchased a small quantity of Pan Am stock to secure a legal position and they retained counsel, thus threatening by litigation to tie up the proposed sale. This agitation on the part of the Blausteins led to negotiations, partly controversial, and on July 15, 1932, an agreement (called from its place of making the " White Sulphur agreement) " was concluded between Indiana, Pan Am and the Blausteins, giving the Blausteins twenty-six per cent and Indiana seventy per cent of Pan Am's stock and providing equal representation for both on the board. That agreement, however, was canceled in October, 1932, at the Blausteins' request.

Negotiations were resumed and finally resulted in what is called the " definitive agreement " between Indiana, Pan Am, Amoco, Baltimore and the Blausteins, signed February 17, 1933, predated to January 1, 1933. The purpose, as stated in the agreement, was to effect a reorganization of the companies concerned " to form a complete cycle and unit in the oil business " which would acquire property, produce its own reserves of crude oil products, refine and market them.

Pan Am acquired the balance of Amoco and Baltimore stock. Out of a total of 4,702,945 shares of Pan Am, the Blausteins received 1,286,876 shares; they were to direct marketing of the reorganized company for four years; for such time the father, Louis, was to be president and the son, Jacob, executive vice-president of Pan Am at salaries jointly totaling $120,000 a year, and also president and general manager, respectively, of Amoco which became Pan Am's chief marketing subsidiary. In connection with their Pan Am stock, they were given an option or so-called " put " under which they could compel Indiana to purchase all or any part of their Pan Am shares at book value plus $1 per share but not less than $13.52 a share. This option, which for four years protected the Blausteins from loss, was used by them to the extent of selling 384,962 shares.

Pan Am agreed among other things to provide before February 10, 1934, a refinery for a thru-put of 40,000 barrels of crude oil per calendar day, failure to complete which on specified dates required Indiana to indemnify Pan Am for any difference in the price.

The agreement also provided that Pan Am "shall actively proceed to secure its own sufficient crude oil production as a reserve" for its requirements, and for such purpose "shall immediately allocate an initial sum of $3,000,000 to be expended under the supervision of the Board of Directors for the acquisition of crude oil producing properties." All parties agreed "to use their best efforts, resources and personnel" to establish and maintain a sufficient backlog of crude oil properties; until such reserve was accumulated Pan Am had the option "to require Indiana to supply, to the extent of its ability and without loss to itself, * * * all or any part" of Pan Am's deficiency "at average prevailing field prices."

The agreement also provided that the board of directors of Pan Am "shall have the right at all times to fully control the business of the Company and to reverse any decision of the Blausteins whether upon marketing operations or otherwise." In the event of disagreement, the Blausteins were given the option of terminating their management contract and requiring Indiana to buy their stock under the above-mentioned stock option. While the Blausteins continued to hold twenty-five per cent of the Pan Am stock issued to them, they had the right to name three of the nine Pan Am directors and two of the seven executive committeemen and they did so during the main period in litigation from the end of March, 1933, to the date of the commencement of the action in January, 1937.

At the Blausteins' request, because it contained matters of a "personal" nature, the definitive agreement itself was not presented to the stockholders at the Pan Am stockholders' meeting on March 27, 1933; instead a plan of reorganization embodying its corporate features was presented. The Blausteins' four-year personal insurance against loss was not revealed to the other minority stockholders in the plan or at the stockholders' meeting.

On March 28, 1933, the three Blaustein nominees were elected to the Pan Am board, Louis as director and president, Jacob as director and first vice-president, and Alvin Thalheimer, an "in law" relative of the Blausteins, as director. The other directors were the defendants McKeever, Carroll, Seubert, Barkdull, Bullock and Jackson. Seubert was president of Indiana. He and the three last named above were directors of Indiana. Accordingly, of a

total of nine on the Pan Am board, there were then four interlocking Indiana-Pan Am directors.

Plaintiffs contend that defendants fraudulently breached the letter and spirit of the definitive agreement and violated claimed fiduciary duties as majority stockholder or directors of Pan Am, including the duty to make Pan Am a fully integrated company. These alleged breaches relate to four major factors in the oil business, viz., processing, production, purchasing and pipe lines. In processing, the claimed breach was the failure to build, as expressly required by the definitive agreement, a 40,000-barrel a day refinery by 1934, and instead building only a 24,000-barrel refinery. In production, the breach alleged was failing to provide Pan Am with its backlog of crude oil producing properties and using instead the production properties of Indiana's subsidiaries to Indiana's claimed profit. In purchasing, the charge was failing to provide Pan Am with its own separate crude oil purchasing department and using instead Indiana's subsidiaries to Indiana's claimed profit. With regard to pipe lines, the charge was failing to provide Pan Am with its own trunk pipe line and using instead that of Indiana's subsidiary to Indiana's alleged profit and Pan Am's loss.

Against the director defendants, in addition to alleged conspiracy, fraud, waste, misfeasance, negligence and breach of trust, plaintiffs also charged breach of sections 60 and 61 of the General Corporation Law. There were minor claims on which the trial court directed judgment for defendants from which plaintiffs do not appeal; the claims are not relevant to issues raised on appeal and, accordingly, we do not mention them.

### BASIC RULINGS OF TRIAL COURT.

The court found that there was no conspiracy as charged by plaintiffs among any of the defendants and dismissed that cause of action in its entirety on the merits as against all defendants and granted defendants judgment on the merits thereon against plaintiffs. From this part of the judgment against them, plaintiffs withdraw their appeal.

In connection with the processing branch of the case, plaintiffs charged that defendants, including New Jersey and Teagle, its president, in bad faith fraudulently and intentionally wasted Pan Am assets and compelled it to pay millions of dollars in excess of what its refined products would cost if Pan Am had built its own 40,000-barrel a day refinery by February, 1934, as expressly required in the definitive agreement. The trial court ruled that as Indiana, the claimed fiduciary, had made no profit on this transaction, plaintiffs had the burden of proof to show that there was fraud and waste, and held that plaintiffs failed to sustain such

burden; that there was no conspiracy, fraud, misfeasance, negligence or waste; that the terms of the definitive agreement could not bind the directors who were required to use their own best judgment on the facts existing at the time they made their decision; that in the light of the surrounding business conditions in the depression year of 1933 the directors were justified in making the capital refining expenditures gradually, and that the court would not substitute its own judgment for that of the directors fairly exercised. Accordingly, on the processing branch of the case, the court granted judgment on the merits in favor of defendants. Plaintiffs' appeal from that part of the decree has also been abandoned. But this feature of the case is relevant in connection with other holdings.

As against defendants on the other three main factors, production, purchasing and pipe lines, the trial court basically held that Indiana, as majority stockholder, so dominated Pan Am as to become a fiduciary for the minority; that it profited through such domination at Pan Am's expense in the transactions relating to production, purchasing and pipe lines and must account for all such profits. The court ruled plaintiffs had the burden to show Indiana was a fiduciary, but once that fiduciary relation was shown, and the court held it had been shown, the presumption of propriety in the votes of the majority directors was held to be destroyed, and in all these transactions in which Indiana was claimed to profit at Pan Am's expense, the burden was shifted to defendants affirmatively to show the transaction was justified and also fair. For justification, the court required defendants to show that it was impossible under any circumstances to procure the necessary production, purchasing and pipe line facilities in any manner other than the directors did. The court did not find that the terms of the transactions and contracts made in connection with these matters were in themselves other than fair and reasonable and according to the prevailing market prices, but held this was immaterial as the burden of justifying the initial act of entering the transaction to Indiana's alleged profit was not sustained. On these three factors the court also held the individual defendant directors personally and severally liable with Indiana, not on the ground of fraud, bad faith or personal profit, but on the ground that they co-operated through their votes in appropriating for Indiana, Pan Am's corporate opportunities and profits in the production, purchasing and pipe line transactions and directed them also individually to account.

While the court expressly ruled the definitive agreement could not bind the directors' judgment in connection with the refinery,

nevertheless, in connection with the production, purchasing and pipe line transactions, wherein Indiana as alleged fiduciary was said to profit, the court held that the definitive agreement outlined " the affirmative obligation which the fiduciary assumed to the *cestui*."

In addition to directing an accounting and appointing a referee to take and state the account, the court granted broad injunctions restraining defendants from (1) interfering with free competition between Pan Am and its subsidiaries and Indiana and its subsidiaries with regard to the purchase of crude or crude properties; (2) preventing Pan Am from establishing its own purchasing department, constructing its own gathering systems and its own pipe line; or (3) diverting legitimate business opportunities of Pan Am to Indiana or its subsidiaries. The court refused, however, plaintiffs' demand for more drastic injunctive relief forbidding Indiana from voting its own stock, directing transfer of its stock to a representative of the court, requiring so-called " independent " directors to be elected, or directing Indiana to dispose of its stock by distribution among its stockholders; this was denied on the ground that such relief " would deprive Indiana of its property rights * * *."

## DEFENDANTS' APPEAL.

We will now consider the trial court's rulings in greater detail and our disposition of the issues raised in relation to the three major factors on which defendants were held liable.

## THE PURCHASING AND PIPE LINE TRANSACTIONS.

At the outset it is essential that the claimed liability of Indiana and the director defendants be considered in the light of the facts and circumstances presented when the directors were required to act, not in the light of hindsight available years after when the trial was had. When the directors met after the reorganization in the spring of 1933, they knew that Pan Am for its 1934 market required nearly 17,000,000 barrels of crude oil or about 48,000 barrels per calendar day; that the New Jersey contract provided adequate supplies of gasoline only to December 31, 1933, and that the vital problem was how to meet all Pan Am's requirements from and after January, 1934. To the extent that such requirements were not met, Pan Am would lose *pro tanto* its market, customers and profitable operation.

A purchasing department in the oil business is a separate department or subsidiary that purchases crude oil, locates its sources, secures connections, gathering and storage systems, and arranges for transportation. The definitive agreement made no mention

whatever of a purchasing department for Pan Am. Because, however, the purpose as stated in that agreement was " to form a complete cycle and unit " in the oil business, the trial court held a purchasing department was inferentially promised. The same purpose was contained in the plan of reorganization attached to the reorganization contract on which the stockholders voted. But in both documents that statement of purpose is immediately followed in the same paragraph by the words: " To accomplish this purpose " Amoco was to increase its shares, Pan Am increase and reclassify its shares and form a new subsidiary, Amoco to acquire Baltimore stock and certain subsidiaries of Pan Am, and Pan Am to acquire all of Amoco's stock. That was the explicit implementation to accomplish the expressed purpose of forming a unit.

Even if the definitive agreement explicitly required Pan Am immediately to create in 1933 a separate purchasing department and to build its own trunk pipe line, that would not deprive the directors of the right and the duty to exercise their own judgment and discretion in the matter. With regard to processing, the definitive agreement was most explicit, and despite this the trial court properly held that it was the directors' duty " to use their best judgment irrespective of the definitive agreement."

This is not an action *ex contractu* brought by the Blausteins as parties to the definitive agreement. Instead of suing on that agreement they elected to bring this derivative suit as minority shareholders and directors based not upon a breach of that contract but on the stated charges of (1) fraud, (2) conspiracy, (3) waste, (4) negligence, and (5) breach of trust. The trial court did not find in plaintiffs' favor on the first four grounds and the issues on appeal essentially relate to the fifth, the alleged breaches of fiduciary duties. The definitive agreement was properly admitted in evidence, but it was not the basis of an action on contract, nor in our opinion should it, in this derivative action, have been taken as the basis of the defendants' duty, obligation or liability. In imposing liability the trial court relied on the definitive agreement as outlining " the affirmative obligation " of Indiana. This ruling suggests an intendment that Indiana as majority stockholder should have dominated the board to carry out the agreement whether or not in the directors' judgment its proposals, expressed or implied, were deemed wise and expedient by the directors themselves when called upon to act. The opinion indicates a determination to enforce in this derivative action the definitive agreement in all its clauses including so-called inferential clauses (except on the refinery issue) just as they might be sought to be enforced

were the action on the contract itself and solely between the parties thereto.

We think the definitive agreement could not deprive the directors of their duty to manage the corporation in the exercise of their own judgment and discretion in the light of facts and conditions faced when they were called upon to act. Even if the objects of signatories to the agreement seemed to them at the time they signed it the highest wisdom and the best possible course for Pan Am to pursue, neither that agreement nor any other contract among such parties could be made the inflexible rule of corporate policy from which directors could not deviate without breach of duty. Corporate management is vested by law in the corporation's directors and no such contract can bind directors to predestined action irrespective of their own judgment and discretion. (*Manson* v. *Curtis*, 223 N. Y. 313; *McQuade* v. *Stoneham*, 263 id. 323; *Rosenthal* v. *Light*, 185 App. Div. 702; affd., 227 N. Y. 587.) To the processing clauses where the provisions requiring a refinery were most explicit as to type, size, capacity and date of completion, the trial court applied this rule, but failed to apply it to the other factors on which the agreement was either silent or indefinite. We think this was error.

The directors' problem in the spring of 1933 was to make reliable arrangements for dependable crude oil supplies to meet proposed refinery operations to be initiated by January, 1934, on the enormous initial scale of 48,000 barrels a day. Spot or open market purchases for such supply could not be relied on by prudent men. Accordingly, within the relatively short period allowed for successful planning, the directors had either to organize a separate purchasing department and successfully solicit in the field sufficient sources of crude, provide the large personnel and all the other required physical facilities so as to have an assured and immediately available gathering system, trunk pipe line and storage for the required quantity of crude; or in the alternative to make contracts with established purchasers and pipe line owners on fair terms.

Eighty-five per cent of the oil legally allowable under Texas regulations was being purchased and gathered by major companies. The definitive agreement provided that Indiana would " supply to the extent of its ability and without loss to itself * * * all or any part of the deficiency in crude oil * * * necessary for Pan Am's requirements at average prevailing field prices." There was no guaranty, however, that Indiana or S. C. O. P. would be continuously able to furnish such crude as Pan Am might at any time call for. Such assurance reasonably required contractual arrangements defining the numerous details.

The cheap prices of early 1933 were not of long duration. By the end of September the price rose to one dollar a barrel and never fell lower thereafter. Obviously, it would take many months to provide a proper purchasing department assuming it could have been extemporized by September, 1933, when Pan Am, under one of the contracts attacked, began to take crude oil deliveries from S. C. O. P. These problems were discussed at various meetings and elaborate surveys were prepared and submitted and carefully considered.

All the directors, including the Blausteins, at the May 31–June 1, 1933, meeting agreed that S. C. O. P. would handle the purchase of all crude for Pan Am on the basis of a charge of five cents a barrel until December 31, 1933, then to be revised downward. Drafts of the crude oil purchasing and pipe line contracts were submitted to the board at the meeting on July 28, 1933.

Jacob Blaustein testified that at the July twenty-eighth meeting he objected that the proposed purchasing contract was to be one of purchase and sale rather than agency and that the contract would prevent Pan Am from using crude oil, if any, produced by a production affiliate and crude that might be acquired at lower prices. Clarence L. Tappen (deceased since the trial), of the firm of Kellogg, Emery & Inness-Brown, since 1915 Pan Am's general counsel, produced at the trial the original draft of the contract on the margin of which he had made notes of Blaustein's objections, and testified from such notes that Blaustein had not objected that the contract was one of purchase and sale rather than agency. Tappen was corroborated by other witnesses and the minutes make no mention of such specific objection. Barkdull, Stephens, Carroll, Jackson and McKeever concurred in the Blausteins' objection to the complete requirement feature of the contract. Here it may be noted that if, as claimed, Indiana dominated a completely subservient Pan Am board, the majority could have then accepted a complete requirement contract with S. C. O. P. and thus forthwith effectively prevented Pan Am from entering production, if that was their purpose. They did not do so. On the contrary, an additional paragraph on "Cheaper Crude" was thereafter incorporated into a three-year contract with S. C. O. P. to provide that Pan Am could purchase directly in the field from other sources, if it could do so for less than S. C. O. P.'s cost charges to it. In the contemporary documents there is the absence of objection to the marketing charge or the selling arrangement. The definitive agreement connotes a selling arrangement.

The purchasing contract finally approved, the Blausteins alone objecting, provided that S. C. O. P. would sell and deliver to Pan

Refining (a Pan Am subsidiary) all its crude requirements for three years commencing September 24, 1933, except to the extent that Pan Refining could procure its requirements elsewhere at a lower delivered cost, or procure its own crude production. A marketing charge of five cents a barrel was allowed to January 1, 1934, which thereafter was reduced to the actual cost, or the service could be terminated if Pan Am could obtain the product at a lower cost than S. C. O. P. was willing to meet. In brief, the directors after a careful survey of the facts decided in 1933 that to meet its crude purchasing requirements Pan Am should make a crude purchasing contract with S. C. O. P. to buy its requirements less oil that it could produce or obtain more cheaply from others. The arrangement did, as the event showed, procure a dependable supply of crude at market prices sufficient to meet all Pan Am's requirements and the company prospered. The terms of the purchasing contract were fair and reasonable. The trial court made no finding to the contrary. We think the evidence establishes that the crude purchasing contract was shown to be reasonably necessary to insure Pan Am the crude essential to its operation. Subsequently other crude purchasing contracts were made. By 1939 Pan Am was procuring directly in the field more than fifty per cent of its own requirements. The directors were obliged to act in the midst of a nationwide business depression that reached its lowest depths in the spring of 1933 and was especially acute in the oil industry. On the facts disclosed we think the court erred in holding immaterial the fairness of the purchasing contracts.

The same problems faced the directors in the spring of 1933 with regard to pipe line transportation which is closely associated with crude purchasing. It was conceded that the cheaper arrangement would be to have Pan Am build its own direct trunk pipe line two hundred miles long from the East Texas field to the Gulf Coast, provided it could get sufficient connections, physical and contractual, to assure a supply to meet by 1934 its required refinery output of 48,000 barrels a day. Although the definitive agreement said nothing with regard to the construction of a pipe line, the trial court, considering such line necessary to a fully integrated company, held it had been inferentially agreed to; that Indiana had taken this business opportunity for itself through its subsidiary S. P. L. at a profit, and accordingly directed Indiana and the directors to account for all profits made (including an alleged secret profit on a so-called Winkler transaction) and for all damages sustained by Pan Am not having its own trunk pipe line.

The board's paramount problem in 1933 was the assured sufficient supply whether through Pan Am's own trunk line or through

arrangements with the existing available and reliable facilities. At a board meeting on April 5, 1933, Peake, a director of Indiana, S. C. O. P. and S. P. L., was asked to make a survey and report to the Pan Am board. Under the definitive agreement, Pan Am, until it accumulated sufficient reserve for its own requirements, had the option "·to require Indiana to supply to the extent of its ability and without loss to itself * * * all or any part" of Pan Am's crude oil requirements. Indiana also agreed to supply Pan Am and its subsidiaries any information or service requisite at actual cost to Indiana. Peake, employed by Indiana and an expert, made numerous reports and recommendations fully documented with surveys and estimates; and pipe line matters were fully discussed at various meetings. At a meeting on May 31–June 1, 1933, the executive committee, including the Blausteins, unanimously agreed that S. P. L. construct for Pan Am a line from Sinco to Texas City and a line from Sinco to the Humble refinery at Baytown. These were not trunk lines. It was similarly agreed that Peake be authorized to negotiate with Humble for connections and if satisfactory terms were reached that Pan Am should lease the S. P. L. line from Mexia to Sinco, Peake to submit the proposal to the board. Peake was also required by the entire board including the Blausteins to procure and furnish further data and information at a later meeting.

On June 28, 1933, Peake submitted four possible plans for transportation which he discussed in a separate conference with Louis Blaustein. The latter agreed that he was willing to go along on plan No. 3. This required Humble to acquire and transport crude from East Texas to Bullock Station, S. P. L. to increase the capacity of its line from Hufsmith to 50,000 barrels a day, Pan Am to build Sinco stub lines to Baytown and Texas City, and S. P. L. to lease to Pan Am the portion of its line from Mexia to Houston. Peake told the board that Humble would turn over to S. C. O. P. additional crude connections in East Texas to the extent of 10,000 barrels based on the then legal East Texas allowable of 550,000 barrels a· day, and said that other East Texas crude was not available in the volume required by Pan Am. The board after full discussion by unanimous vote, including the Blausteins, directed the incorporation of Pan American Pipe (a Pan Am subsidiary); authorized S. P. L. to construct for Pan Pipe a twenty-mile pipe line from York Junction to Baytown and a thirty-one mile line from Sinco to Texas City; authorized Pan Am's pipe line subsidiary to assume the contract between S. P. L. and Humble for the first three years of its term, thus giving Pan Am the benefit of the lower tariff agreement Humble

had made with S. P. L., and also agreed to lease arrangements of a portion of S. P. L.'s pipe line. All these arrangements furnished through pipe line facilities to Pan Am. The formal contracts when drawn along the lines specifically discussed and approved at the meeting were to be subject to the board's approval.

At the next meeting on July 28, 1933, the pipe line arrangements previously unanimously approved in detail were presented to the board in the form of contracts and adopted by majority vote. Blaustein alone objected, not because the contracts were by their terms unfair, unreasonable or unnecessary, but, as the minutes of the meeting show, because they were closely related to the purchasing contract to which he took exception.

At the trial Jacob Blaustein testified that he voted in the negative because the contract was inconsistent with an "understanding" at the previous meeting that S. C. O. P. would act as purchasing agent until January, 1934, instead of as seller. All director defendants present at the meeting contradicted this and testified he objected solely on the ground that Pan Am would be prevented from utilizing the crude properties it might acquire. Their testimony was corroborated by Tappen, Pan Am's general counsel, who testified that Blaustein made no reference to any "understanding" of any "agency" arrangement. The proposed contract was not inconsistent with any understanding reached at the previous meeting. Blaustein's action in originally agreeing to the contracts in principle indicates that all the directors at the time were convinced that the pipe line transportation arrangements were reasonable, necessary and fair.

The salient issue on the proposed trunk pipe line was the availability of connections in the East Texas field in the spring and summer of 1933. Jacob Blaustein testified he knew of plenty of connections (and also spot purchases) but did not at the time make any specific suggestions of them to the board. The pipe line scout reports on which plaintiffs rely do not show loss of connections by purchasers but only changes in pipe line carriers. They are not helpful in determining availability of connections. Plaintiffs produced as their expert, one Hudnall, an oil geologist and appraiser who had never represented a purchaser of crude. In answer to a hypothetical question, he expressed the opinion that it would have been possible to obtain connections between April and December, 1933, of sufficient legally produced oil to provide by January, 1934, a flow of 48,000 barrels a day.

Against this was the unanimous opinion of all defendants' witnesses who in 1933 represented thirteen of the major purchasing companies engaged at that time in crude purchasing in the East

Texas field buying eighty-five per cent of the entire legal production therein. All testified that sufficient connections to meet Pan Am's requirements could not be obtained by January 1, 1934, without a contract with one of the major purchasers. Answering in the negative the question Hudnall answered in the affirmative, they testified that at the time all believed the legal allowable would be greatly reduced and they were not willing to release East Texas connections. Concededly the legal allowable was drastically reduced. Their testimony was also corroborated by Stanley, the chief enforcement officer of the Oil and Gas Division of the Texas Railroad Commission which had charge of the legal allowables which were drastically reduced. All of this evidence tended to corroborate Peake and Dietler who made the major solicitation for connections. In rebuttal plaintiffs produced one Barnes who never bought or sold a connection in 1933 and had no knowledge of the availability of connections in East Texas prior to 1936, and one Warren who up to July, 1933, had been buying oil produced in excess of the legal allowable fixed by the Texas Commission and had solicited no connections in East Texas prior to July, 1934. S. C. O. P., with all its experience and resources, its own and Humble's connections, was able by January, 1934, to obtain connections yielding only 37,000 barrels of crude a day against the 48,000-barrel requirement, the deficiency being made up by S. C. O. P.'s calling upon its Bullock storage reserves. In spite of this evidence, the trial court found that Pan Am " could have " obtained sufficient connections. The finding of Special Term disregards all the testimony given by the men best informed on the subject, the overwhelming majority of whom were not defendants and had no financial interest in the action. On the basis of the facts and conditions at the time, we think the directors' decisions on the purchasing and pipe line transactions were made in good faith and in the exercise of their honest judgment and discretion, and that the non-availability of connections was established by a preponderance of credible testimony.

At the end of its opinion the trial court expressed a doubt as to the wisdom " at this late date " of constructing a separate Pan Am trunk pipe line and asked for further memoranda, but evidently resolved the doubt in plaintiffs' favor, as the judgment granted on this aspect of the case is in effect a mandatory injunction directing construction of a trunk pipe line. We see no reason why these directors were under a binding mandate to build a separate Pan Am trunk pipe line and provide a separate purchasing department or subsidiary during the first years of the company's existence and the worst years of the economic depression, when they con-

tracted, as the trial court found, at fair market prices for the purchase, gathering, storage and transportation of oil sufficient successfully to meet all of Pan Am's requirements. Indiana, one of the larger oil companies, did not itself acquire its one-half interest in the Sinclair Pipe Line & Purchasing Company until 1921, ten years after its separate existence which began in 1911; it acquired the remaining half in 1930, nineteen years after it began as a separate oil company; and in 1937, twenty-seven years after Indiana started, it was, itself, producing less than fifty per cent and purchasing over fifty per cent of its requirements in the open market.

The court also found, as part of the 1933 pipe line arrangement, that Indiana through S. P. L. profited by procuring for itself from Humble a reduction of about six cents in the cost of transporting Indiana crude from a field called the Winkler field in West Texas to Whiting, Ind.; that the S. P. L.-Humble pipe line arrangement was part consideration for that reduction; and accordingly directed defendants additionally to account for any sums saved by S. P. L. as a result of such reduction. The controversies between Humble and S. P. L. concerning the Winkler tariff had nothing whatever to do with Pan Am. They had commenced long before there were any negotiations on Pan Am's pipe arrangements. The adjustment of that dispute, having no relation to Pan Am's pipe supplies, was a *bona fide* transaction in which S. P. L. received no profit at Pan Am's expense. The accounting decreed is clearly erroneous.

## CRUDE PRODUCTION.

The definitive agreement expressly provided that Pan Am should secure its own sufficient crude oil production properties, immediately allocate $3,000,000 for the acquisition thereof, and all parties were to use their best efforts to secure a sufficient backlog of crude oil properties for Pan Am.

The trial court found that all major oil companies have the policy of procuring their own crude production lands or leases to become fully integrated companies; that Pan Am especially needed such properties since, by the sale of its foreign properties, it had lost its own chief sources of supply; that *prima facie* there was an obligation on the directors to procure such oil-producing lands but that they did not begin to do so until May, 1935, the first properties being actually purchased in September, 1935; that the sole reason asserted for the delay, the opinion rendered by Stephens, Indiana's general counsel and Pan Am director, that it would be illegal under the Texas anti-trust laws for Pan Am then to enter Texas production, was not valid; that Pan Am's own counsel were not

authoritatively consulted and no independent legal advice was sought, although the directors had a clear duty to furnish such advice; that although the directors had relied in good faith upon Stephens' opinion and although his opinion was not a crass subterfuge or contrary to his own belief, the board had no right to rely on Stephens; that Pan Am's financial inability, if it existed, was not a defense; and that accordingly Indiana and the directors must account to Pan Am for all profits by S. O. & G. on crude oil sold Pan Am from April, 1933, to the date of the decree, produced from specified East Texas fields on the ground that it was " logical to assume * * * that those fields were the ones advantageous to Pan. Am." In addition, Indiana, as constructive trustee, was directed to turn over to Pan Am all properties acquired between April 1, 1933, and July 1, 1935, in specified East Texas fields (except the Yount-Lee field) and used to supply Pan Am, less compensation for cost in buying them, or if Indiana could not produce such transfer, it was directed to pay the money equivalent of the oil lands less expenses incurred in acquiring them. This was directed although S. O. & G. and S. C. O. P., Indiana subsidiaries, were not parties to the suit and are foreign Texas corporations. The veil of all the affiliated corporate entities was pierced and the court held that S. O. & G., S. C. O. P. and all other subsidiaries of Indiana and Pan Am were mere departments or business conveniences.

The sole reason advanced for not procuring Pan Am's own crude properties before 1935 was not, as in the case of purchasing and pipe lines, the economic and other factual difficulties but the opinion on which the directors relied that the Texas anti-trust laws made it illegal for Pan Am to engage in Texas production because it was seventy per cent (later seventy-eight per cent) owned by Indiana which already had a wholly owned subsidiary, S. O. & G., engaged in such production.

On March 25, 1933, Stone and Agerton, Texas lawyers, reported that it would be legal for Pan Am to enter Texas production. On April 27, 1933, Stephens told Seubert that he agreed with Stone that the directors of S. P. L. and S. C. O. P. could also serve as directors of a Pan Am producing company to be organized to operate in Texas. Stephens, however, testified that he answered the only specific question submitted at the time, namely, the legality of interlocking directors. The trial court found he had approved thereby introduction of a Pan Am producing company into Texas. On August 8, 1933, Stephens, Indiana's counsel and the only lawyer on the Pan Am board, told Seubert that in his opinion the Texas anti-trust laws prohibited Pan Am from going into Texas production because of Indiana's majority stock control

of Pan Am and S. O. & G. On October 8, 1933, Seubert stated that Blaustein's connection with another company, the Crown Central Refinery, had something to do with the legal difficulties involved. Finally the legal issue was submitted to two Texas lawyers, Judge Batts, selected by Stephens, and Mr. Weems, selected by Steinmann, Blaustein's personal attorney. In November, 1934, Batts and Weems rendered an opinion stating that Texas production by Pan Am would be legal in spite of the Texas anti-trust laws.

On the trial it appeared that Steinmann had previously, in 1933, procured both an oral and a written opinion from Weems but it was never revealed to the board. The trial court held that S. O. & G. was buying property in the East Texas field at the very time Indiana was preventing Pan Am from entering production there and proposing to sell through S. C. O. P. all crude required by Pan Am's Texas refinery; that factually and legally Pan Am could have done the work itself if permitted to do so; and accordingly directed the accounting above indicated not merely of profits but of the lands as well. Specifically the directors' liability was not based on bad faith, or fraud; in the final analysis they were made liable because it was held that they did not consult counsel other than Stephens.

Article 7426 of title 126 of the Texas Civil Statutes defines a trust as " a combination of capital, skill or acts " by two or more corporations which, among other things, (1) creates or may tend to create restrictions in trade or commerce, (2) prevents or lessens competition, (3) unites any interest in connection with the sale or purchase of any commodity for transportation, or (4) abstains from engaging in or continuing in business or from purchase or sale of commodities partially or wholly within the State. Article 7427 makes a combination of corporations a monopoly when (1) direction of affairs is " brought under the same management or control for the purpose of producing " a trust or when such " management or control tends to create a trust " or (2) when one " corporation acquires the shares," bonds, properties, etc., of another corporation " for the purpose of preventing or lessening, or where the effect of such acquisition tends to affect or lessen competition." Penalties for violation of these laws were drastic, viz., mandatory jail sentences from two to ten years, heavy fines, forfeiture of corporate charters, and in the case of foreign corporations, forfeiture of the right to do business in Texas; trials were a jury risk; and, as an incentive to prosecution, successful district attorneys were permitted to share in a substantial percentage of the fines. Indiana owned ninety-nine per cent of S. O. & G. and seventy

per cent (later seventy-eight per cent) of Pan Am. The Blausteins, however, were then financially protected through their " put " requiring Indiana to purchase their stock at the price fixed through their personal contract with Indiana in the definitive agreement.

Stephens testified that in 1932 at the White Sulphur conferences he had advised Steinmann of the facts leading to the formation of S. O. & G. on the advice of Judge Batts to avoid a literal continuing violation of the anti-trust laws. Barkdull, Seubert and Tappen corroborated Stephens with regard to the information disclosed at the White Sulphur conference. Blaustein denied that the anti-trust issue had ever been mentioned until after the definitive agreement, and the transfer of the stock, and Special Term so found. At a board meeting on March 7 and 8, 1933, attended by the Blausteins, Tappen suggested a consideration of the legal status of a second production company going into Texas. Thereafter on March 12, 1933, Tappen, Pan Am's general counsel, and Steinmann discussed whether a producing company should be formed in Texas or in Delaware and qualified in Texas. On March thirteenth Tappen wrote Steinmann that until the legal issue was cleared Indiana was unwilling to introduce the proposed production corporation into Texas. Tappen, Barkdull, Carroll and McKeever all testified that at a meeting on March 17, 1933, Blaustein had been informed specifically about the Texas anti-trust law questioned and agreed to postpone the formation of the production company. The minutes of the meeting indicate that the Texas laws were discussed.

We do not believe that the references to the Texas laws in the minutes and documentary evidence referred, as the trial court found, merely to the matter of whether a Texas or a Delaware corporation should be organized. On the contrary, they relate to the introduction of a producing company into Texas and thus tend to corroborate defendants' testimony. Steinmann on cross-examination refused to deny that the legal question " as to the entry of a Pan American producing company " in the State of Texas had been discussed with him prior to March 28, 1933. It should be patent why an issue of that kind was not specifically mentioned in the definitive agreement or plan of reorganization which might later be used in a Texas criminal prosecution. The weight of the credible evidence established that Steinmann and the Blausteins were informed of the matter. Stephens' letter of April 27, 1933, dealt with the only question he was then specifically asked to answer, which he had submitted to Judge Stone, namely, whether there was anything illegal in an interlocking directorate. S. O. & G., organized in 1930, consisting in part of a merger of other com-

panies, was aimed to cure what was feared to be a continuing violation of the Texas anti-trust laws.

We find that Pan Am counsel were consulted regarding the anti-trust issue. Tappen and his partners, Frederick R. Kellogg and Dean Emery, regarded as doubtful the legality of the proposed Texas production corporation. Pan Am's general counsel frequently consulted with Stephens in the matter and concurred in his opinion. Moody, former Attorney-General and Governor of Texas; Judge Strong, for forty-three years a Texas lawyer and former judge of the Texas Commission of Appeals; Black, a member of the Texas bar for thirty-three years and leading Texas appellate counsel; and Wright, an experienced Texas corporate and trial lawyer, all agreed with Stephens' conclusion.

The final Batts-Weems opinion was based in part on the idea that the Texas anti-trust laws were unconstitutional. That was subsequently proved to be erroneous. (*State* v. *Standard Oil Company*, 130 Tex. 313; 107 S. W. [2d] 550; *Tigner* v. *Texas*, 310 U. S. 141.) It also relied on a case decided after Stephens had rendered his August, 1933, opinion which was said by Batts and Weems to apply the " rule of reason " to the anti-trust laws. (*Jones Investment Co.* v. *Great Atlantic & Pacific Tea Co.*, 65 S. W. [2d] 495.) That had not been the rule applied immediately before. Writing in February, 1935, Batts and Weems stated that " until recently no rules have been laid down which would enable an attorney to come to a safe conclusion as to what might be held by the Texas courts. Recent decisions have placed the matter in a much more satisfactory condition."

The trial court did not find bad faith on the directors' part in relying on Stephens' opinion but found breach of a fiduciary duty in not procuring other additional legal advice. The court found that Stephens' opinion was not a crass subterfuge or contrary to his own belief. Each case must be decided on its own facts. Important considerations are the presence of good faith and the absence of fraud or self-enrichment by the director giving and the directors acting upon the advice. In that state of facts and with Stephens' opinion concurred in by Pan Am's own general counsel we think the directors exercised their discretion honestly and in good faith and under all the facts and circumstances disclosed were justified in deferring at the time entrance of a Pan Am production company into Texas.

Plaintiffs do not appeal from the holding that there was no conspiracy or from the judgment against them and in defendants' favor on the conspiracy count. Yet plaintiffs argue this appeal as though the conspiracy with its alleged deliberate fraud

and bad faith had been found in their favor. The absence of any fraud, bad faith or personal profit by the directors, together with the court's finding that there was no conspiracy among the directors or with Indiana or any one else, logically should lead to the conclusion that in deferring Pan Am's entry into Texas production, the directors were not part of any plan to prevent Pan Am from competing with S. O. & G. in production.

INDIANA'S CLAIMED DOMINATION AS MAJORITY STOCKHOLDER.

The trial court properly held that before Indiana could be held as a fiduciary, plaintiffs had the burden of proving that Indiana dominated and controlled Pan Am. In finding that plaintiffs sustained such burden, the court went back to the New Jersey sale when Indiana owned ninety-six per cent of Pan Am stock and found that " domination " then began and had continued to the trial. There is no tangible evidence of this, and the court's finding was an inference based on claimed circumstantial evidence which in our opinion is contradicted by the weight of the contrary evidence.

Mere ownership of a majority or all the stock of a corporation does not in and of itself spell domination. Stockholders are not *ipso facto* trustees for each other. (*Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185; *Gamble* v. *Queens County Water Co.*, 123 id. 91.)

The fiduciary role is not assumed, and the obligation will not be imposed, until a majority stockholder usurps the functions of the directors in the management and conduct of the business of the corporation to the detriment of the corporation and the minority. (*Cleary* v. *Higley*, 154 Misc. 158; affd., 246 App. Div. 698; application for leave to appeal denied, 270 N. Y. 673; *Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 id. 185.)

The fiduciary obligation has been imposed where the majority exercised control so as to bring about reorganization and foreclosure resulting in the minority's receiving nothing (*Southern Pacific Co.* v. *Bogert*, 250 U. S. 483); where control was exercised to bring about foreclosure so as to enable the majority to acquire property at less than its value to the injury of minority stockholders (*Farmers' Loan & Trust Co.* v. *New York & Northern R. Co.*, 150 N. Y. 410); where it was sought to dissolve the corporation, depreciate value of corporate property and minority proportional interest therein (*Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185); and in cases where control was exercised to enable the majority to take the assets and business of a corporation or more than a proportionate share of the corporate property to the exclusion of the minority. (*Morse* v. *Metropolitan Steamship Co.*, 87 N. J. Eq. 217; 100 A. 219; modified as to receiver's title, 88 N. J. Eq. 325; 102 A. 524.)    When-

ever the majority seeks to appropriate to itself the corporate property, either in whole or in part, to the exclusion and injury of the minority which it has at its mercy, the fiduciary relationship will be imposed. (*Allied Chemical & Dye Corp.* v. *Steel & Tube Co.*, 14 Del. Ch. 1; 120 A. 486.) The Court of Appeals has well stated the applicable rule in *Gamble* v. *Queens County Water Co.* (123 N. Y. 91, 99) as follows: " It is not, however, every question of mere administration or of policy in which there is a difference of opinion among the shareholders that enables the minority to claim that the action of the majority is oppressive, and which justifies the minority in coming to a court of equity to obtain relief. Generally, the rule must be that in such cases the will of the majority shall govern. The court would not be justified in interfering even in doubtful cases, where the action of the majority might be susceptible of different constructions. To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company and in a manner inconsistent with its interests. Otherwise the court might be called upon to balance probabilities of profitable results to arise from the carrying out of the one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seemed to it to promise the best results, or at least to enjoin the carrying out of the opposite policy. This is no business for any court to follow."

In imposing the fiduciary duties on the majority stockholder herein, the trial court relied on many cases that formulate the law of fiduciary duty for strictly technical and formal trustees. *Magruder* v. *Drury* (235 U. S. 106, 120) related to an executor, an express testamentary trustee, who received for his own firm a commission on certain loans. *Jackson* v. *Smith* (254 U. S. 586) related to a receiver of the assets and property of an estate who arranged with others to bid in such assets when sold at an advertised sale. *Michoud* v. *Girod* (4 How. [U. S.] 503) related to an executor.

Other cases relied on are distinguishable on their facts. In *Irving Trust Company* v. *Deutsch* (73 F. [2d] 121) a trustee in bankruptcy of Acoustic Products Corporation sued Deutsch, Acoustic's president, who had been instructed by resolution to

raise funds to enable Acoustic to take up a specific offer made to Acoustic of certain DeForest patents, but he formed a syndicate which acquired title to the patents and later resold them. In *Pepper* v. *Litton* (308 U. S. 295) a majority stockholder entered into a fraudulent scheme to defeat a *bona fide* creditor of the corporation in bankruptcy by setting up a bookkeeping entry wage claim of his own on which the corporation was caused to confess judgment. In *Wheeler* v. *Abilene National Bank Bldg. Co.* (159 Fed. 391, 395) the majority stockholder sold the corporate assets to himself for a sum less than what had been offered for them by the minority. In *Meeker* v. *Winthrop Iron Company* (17 Fed. 48; revd., 122 U. S. 635) the majority stockholders voted all the corporate property to their individual use by leasing it to themselves through a wholly-owned corporation at one-half the royalty previously contracted for, and transferred to themselves the beneficial interest of the corporate property for the eighteen years of the lease. In *Guth* v. *Loft, Inc.* (5 A. [2d] 503), Guth, president of Loft, which essentially required another cola drink after terminating its relations with Coca Cola, purchased the Pepsi Cola formula for himself when it had been offered to him as Loft's representative, and then used the working capital and facilities of Loft to exploit it and resell the products to Loft at a profit to himself.

The fiduciary theory will not be employed merely to enable a minority to dictate corporate policies. We think the evidence establishes that Pan Am was managed during the period in question by its own board of directors, exercising in the transactions attacked their own judgment for what, at the time, they believed in the light of existing facts and circumstances to be for Pan Am's benefit. At no time was a majority of Pan Am's board or its subsidiaries directors, officers or employees of Indiana. There were originally four Pan Am-Indiana interlocking directors, Seubert, Barkdull, Stephens (succeeding Bullock in 1933) and Jackson. Jackson apparently attended few meetings after March 28, 1933. In 1933 and 1934 when most of the transactions attacked occurred, three of the nine directors were named by the Blausteins and voted as a single block. McKeever and Carroll, vice-chairman and treasurer of Pan Am, were neither directors nor officers of Indiana. McKeever had been associated with Pan Am since 1915, years before Indiana had any stock in the company. Carroll had been employed by Indiana but had joined Pan Am in 1927. To get the benefit of Indiana's stock purchasing plan, he was nominally on Indiana's payroll, but Pan Am reimbursed Indiana for his entire salary. There is no proof that Seubert or anybody else dictated McKeever's or Carroll's votes against their own mind

and honest judgment. There is no proof whatever of any concerted agreement. The claimed conspiracy essential to such concerted action was dismissed on the merits by the trial court, and plaintiffs do not appeal. Wilson, formerly an associate professor of the Massachusetts Institute of Technology, severed all connections with Indiana when he was employed by the Pan Am directors including the Blausteins. That Indiana experts were consulted, that statistics and news letters were sent to Indiana are not proof of domination. Such co-operation was contemplated by the definitive agreement. Consolidated statistics are required by stock exchanges and governmental bureaus. There was no wrong in furnishing consolidated statistics or news letters giving information of the majority stockholder, which clearly had the right to such information regarding its large investment.

In the final analysis, the trial court seemed to rest its decision on what it referred to as the frailties of human nature. The court said it was inconsistent with " all human experience " that when Seubert, Barkdull and Stephens walked into a Pan Am board meeting they could forget they were directing heads of Indiana. The issue, however, in each case is not to be decided on general views of human nature but on the particular facts established in each case showing the type, character, standing, experience, integrity, ability and the action taken by the particular directors involved. On the court's own reasoning, the status after trial contains as before all the same " potentialities of domination." Yet the court properly denied Blaustein's request to have these men removed and so-called " independent " directors elected in their stead.

Perhaps it may be desirable, as some contend, to prohibit by law all interlocking directorates or personnel. We are not called upon to pass on that. Thus far neither the numerous statutory corporate laws, State and Federal, nor court decisions have outlawed interlocking directors as such. Determination of domination may not rest merely in the fact that there was an interlocking directorate, especially where, as here, at no time was there a majority of Indiana interlocking directors on Pan Am's board and the directors acting in good faith did not personally profit in any way in the transactions in question. The trial court expressly so found. The individual director defendants were held liable for this enormous judgment although the court did not find any fraud, bad faith, conspiracy or personal profit on their part in any of the transactions attacked.

On this record, we hold plaintiffs have failed to establish by a preponderance of the credible testimony that Indiana, as majority

stockholder, so usurped the functions of the board of directors of Pan Am in the transactions attacked that they failed to exercise their independent judgment in good faith.

Berle and Means in The Modern Corporation and Private Property (pp. 236, 237) state that a director becomes " a dummy not because of a contract but because of his nature. First-rate men will never be dummies; third-rate men can never be prevented from being dummies where they are in fact dependent on the will of a small group, even though no precaution is taken by contract to make them so." The directors here attacked were first rate men of outstanding experience, ability and recognized character individually and as officers in the oil business in the United States. Neither in the prolonged examinations before trial nor in the direct or cross-examinations at trial was anything established to impugn their integrity, competency or ability. Nothing was adduced to show that any of them, including McKeever, who was never connected with Indiana, and Carroll, who was never an Indiana director or officer, were not acting with an honest desire to serve the corporation's interest.

Directors are not trustees in the strict, technical sense of the term. (3 Fletcher on Cyclopedia of Corporations [Perm. ed.], § 838, at p. 146.) They occupy what Pomeroy calls positions of partial trust. " To sum up, directors and managing officers, in addition to their functions as mere agents, occupy a double position of partial trust; they are *quasi* or *sub modo* trustees for the corporation with respect to the corporate property, and they are *quasi* or *sub modo* trustees for the stockholders with respect to their shares of the stock." (4 Pomeroy's Equity Jurisprudence [5th ed. 1941], § 1090, pp. 265, 267.) The conduct of directors in relation to their corporation and its stockholders is primarily the subject of proceedings in equity. In *Bosworth* v. *Allen* (168 N. Y. 157) it was said: " While courts of law generally treat the directors as agents, courts of equity treat them as trustees and hold them to a strict account of any breach of the trust relation. For all practical purposes they are trustees when called upon in equity to account for their official conduct."

Directors usually have control of the records of a corporation and are in an advantageous position to offer proof upon any matter which affects their conduct in relation to the corporation. Spellman on Corporate Directors says: " When a stockholder or other interested party attacks transactions entered into by or with members of the board, fairness requires that the burden of proof should rest upon the affected directors to justify the acts complained of * * *" (§ 191, p. 502.)

" Burden of proof.— In the ordinary case, where liability is sought to be imposed on a director for personal wrongdoing, the plaintiff has the burden of proving the director's misdeeds. But, if the matter in question involves a director's dealings with the corporation, he sustains the burden of showing the transactions to have been fair, honest, and for the benefit of the entity.

" Once a *prima facie* case of liability has been established, the burden of going forward with the proof rests upon the director to contradict the evidence against him. The ultimate burden of proof, however, remains with the plaintiff, who must establish his case by a preponderance of the evidence. On the other hand, where the director seeks to avoid liability upon admitted facts, through the introduction of exculpatory evidence, such as the fact that he resigned before the action complained of, the burden of proof as to these facts is on him." (§ 262, p. 650.)

In *Glen Allen Mining Co.* v. *Park Galena Mining Co.* (77 Utah, 362, 384; 296 P. 231, 240) the court formulates the rule as follows: " The authorities everywhere recognized the rule that, where a fiduciary relation is shown to exist, the burden is upon the fiduciary to show good faith and fair dealing in his relations with his *cestui que* trust. It is frequently said that the relation of a director to his corporation is not that of trustee and *cestui que* trust. But it does not follow from that statement that the director is not bound by the same rules of good faith, full disclosure, and fair dealing as surrounds the trustee in dealing with the *cestui que* trust. As agents intrusted with the management of the corporation for the benefit of the stockholders and creditors, they occupy a fiduciary relation, and are held liable to the corporation as trustees. The liability of directors and other officers to the corporation is determined by substantially the same principles which determine the liability of any other agent to his principal for failure to perform the duties which he has undertaken."

In its opinion the trial court said: " It should be emphasized that there is no claim, and no finding, that any of the individual defendants [the directors] profited personally in any way in any of these transactions. The individual directors defendants are being held liable not because they received any part of the profits themselves or because they took over for themselves any business opportunities of Pan Am., but on the ground that they appropriated for Indiana the transactions and profits herein discussed." In view of this determination of no personal profit in any form and as there was no finding that they acted fraudulently, negligently or in bad faith, the individual defendants were entitled to the benefit of the presumption that their actions were fair and

honest; and on the findings and the facts disclosed should not be held personally liable. (*Carr* v. *Kimball*, 153 App. Div. 825; affd., 215 N. Y. 634; *Rous* v. *Carlisle*, 261 App. Div. 432, 434, 435; *Briggs* v. *Spaulding*, 141 U. S. 132, 159.)

In *Fisher* v. *Bishop* (108 N. Y. 25, 28) the Court of Appeals, in discussing obligations growing out of a confidential and fiduciary relationship, said: " Lord CRANWORTH in *Smith* v. *Kay* laid down the rule in these words (7 H. L. 771):* ' There is no branch of the jurisdiction of the Court of Chancery which it is more ready to exercise than that which protects infants and persons in a situation of dependence, as it were, upon others, from being imposed upon by those upon whom they are so dependent. The familiar cases of the influence of a parent over his child, of a guardian over his ward, of an attorney over his client are but instances; ' but as said by Lord ELDON in *Gibson* v. *Jeyes* (6 Ves. 266), it is ' the great rule applying to trustees, attorneys or any one else.' It will be seen that the rule is not limited to cases of attorney and client, guardian and ward, trustee and *cestui que trust*, or other similar relations, but it holds good wherever fiduciary relations exist and there has been a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding." Considering this case realistically, it may not be said that the Blaustein minority herein was in such a position of confidential relationship as to charge the majority with the burden imposed upon a formal trustee. In the recent case of *Moriarty* v. *Butler Grocery Co.* (261 App. Div. 20; affd., 286 N. Y. 687), where the majority stockholder was accused of having improper dealings with the corporation and charging excessive prices by which he enriched himself, it was held that the burden of proof rested upon the minority stockholders to support the derivative action. Assuming, however, that the relationship between the majority stockholder and the minority here required the majority stockholder to justify the transactions and show their fairness, we are of opinion that such burden was met.

### CORPORATE OPPORTUNITIES.

One who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence. This rule is stated in *Loft, Inc.*, v. *Guth* (2 A. [2d] 225, 238) as follows: " if a business opportunity comes to him [the fiduciary] which is in the line of his corporation's activities and of advantage to it and especially if really

---

* 7 Clark, House of Lords, 770, 771.

intended for it, the law will not allow him to divert the opportunity from the corporation and embrace it as his own. If he does so, the corporation has a right to claim the benefits of the opportunity for itself and to impress the property which the director and officers [fiduciary] received together with all profits thereon with a trust in its favor. * * *." The same opinion accepts as a qualification of the rule the following: " ' where a business opportunity comes to an officer or director in his individual capacity rather than in his official capacity as an officer and director, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which the corporation has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it.' "

In *Lincoln Stores, Inc.*, v. *Grant* (309 Mass. 417; 34 N. E. [2d] 704), in discussing the doctrine, the court said: "Directors of corporations have often been said to be trustees. In any event, they occupy a fiduciary relation toward the corporation, and have a duty of reasonably protecting and conserving its interests. *Beaudette* v. *Graham*, 267 Mass. 7, 12; 165 N. E. 671; *Brown* v. *Little, Brown & Co., Inc.*, 269 Mass. 102, 117; 168 N. E. 521; 66 A. L. R. 1284. * * * In this connection it has been said that the duty is only coextensive with the trust so that, in general, the legal restrictions that rest upon officers in their acquisitions are generally limited to property in which the corporation has an interest already existing, or in which it has an expectancy growing out of an existing right, or to cases where the officers' interference will, in some degree, prevent or hinder the corporation in effecting the purposes of its creation. *Lagarde* v. *Anniston Lime & Stone Co.*, 126 Ala. 496, 502; 28 So. 199; *Tierney* v. *United Pocahontas Coal Co.*, 85 W. Va. 545, 564; 102 S. E. 249. It has been said that a director cannot be allowed to profit personally by acquiring property that he knows the corporation will need or intends to acquire, *Golden Rod Mining Co.* v. *Bukvich*, 108 Mont. 569; 92 P. [2d] 316, and that this interest, actual or in expectancy, must have existed while the person involved was a director or officer. *Colorado & Utah Coal Co.* v. *Harris*, 97 Colo. 309; 49 F. [2d] 429; *Guth* v. *Loft, Inc.*, Del. Sup., 5 A. [2d] 503, 510, 511. See *Trice* v. *Comstock*, 8 Cir., 121 Fed. 620, 626, 627; 61 L. R. A. 176."

We find here, however, no factual basis sufficient to support the broad ruling that property bought by S. O. & G. in a particular territory must be held to have been acquired for the benefit of Pan Am. A corporation of the character of the latter had no monopoly of the territory. (*Colorado & Utah Coal Co.* v. *Harris*, 97

Col. 309; 49 P. [2d] 429; *Carper* v. *Frost Oil Co.*, 72 Col. 345; 211 P. 370.) Nor is there involved here the rule of agency which prevents an agent's retaining property in the category of that which he was specifically engaged to exploit for the benefit of his principal. (*Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380.) The broad relief allowed in this case cannot on the facts disclosed be upheld on the theory that the corporation was prevented from acquiring the property in question. The trial court said: " It is true that even if Pan Am had been left to its independent crude producing program it might not have entered these fields; and, if it had, might not have there discovered and purchased leases. It is also true that Indiana spent large sums of money exploring other fields and other pieces of property which did not yield results in the form of oil. It is impossible accurately to determine what would have happened had Pan Am been allowed to avail itself in a reasonably normal manner of its legtimate business opportunities." The only " prevention " sought to be established here was the negative one of postponing activity in crude production. It does not appear that it was ever proposed that Pan Am purchase any of the properties which it has been determined must be held in trust for it. Blaustein testified that although he knew of many cheap properties at the time he did not present them to the board. S. O. & G. and its predecessor corporations had been seeking oil lands and leases for their own proper corporate purposes for years prior to the reorganization of Pan Am in 1933; the oil lands and leases so sought were necessary and appropriate for its business. Its principal predecessor, the Dixie Oil Company, had begun geological work in the Gulf Coast area in 1923 and between 1924 and 1930 had acquired leases in numerous Texas Gulf counties. The East Texas field, one of the greatest oil fields in the world, was discovered in 1930 and 1931. An independent expert testified that due to chaotic conditions little trading was done in the East Texas field till the latter part of 1933. There was development of the Gulf Coast between 1935 and 1938 and more widespread use of geophysical instruments.

S. O. & G. did not discover, buy or develop any fields with funds, assets or information of Pan Am. It had the right to explore for oil wherever it could be found. The trial court's holding is in effect that Pan Am as against S. O. & G. had the exclusive right to explore in the East Texas and Gulf Coast regions. At the time S. O. & G. was in competition in Texas with practically all the major oil companies and up to April, 1939, S. O. & G. was producing less than fifty per cent of Indiana's own crude requirements. For crude produced by S. O. & G. and resold to Pan Am at posted

prices, Indiana would have to purchase elsewhere an equal amount at posted prices. As acquired by S. O. & G., that corporation was free to retain the properties or sell them to a stranger. It was free, also, to produce oil and use it for its own purpose or sell it to a stranger. All oil produced from such properties could have been utilized by S. O. & G. in its own business. Notwithstanding the explorative activities of S. O. & G., Indiana, as indicated, purchases about fifty per cent of its requirements from other sources.

Our reading of the cases in which the doctrine of corporate opportunity has been applied leads us to the conclusion that one primary requisite for the application of the doctrine is the existence of a presently recognizable, tangible expectancy on the part of the corporation in the property, whether tangible or intangible, at the time of acquisition by the fiduciary. (*Lincoln Stores, Inc.,* v. *Grant,* 309 Mass. 417; 34 N. E. [2d] 704.) It has also been held that the doctrine is not applicable if the opportunity is one which the corporation is financially unable to undertake. (*Hauben* v. *Morris,* 255 App. Div. 35; affd., 281 N. Y. 652; *Solimine* v. *Hollander,* 128 N. J. Eq. 228; 16 A. [2d] 203.)

In so far as the unproven properties are concerned, certainly they must be regarded as speculative. The trial court has not imposed the burden and expense of such speculation on Pan Am, but has given it that which was found to be profitable if later the oil therefrom was sold to Pan Am. There is also lacking in this case the element of necessity, which sometimes entitles a corporation to claim on the theory of business opportunity. Had S. O. & G. utilized all of the oil for its own corporate purposes, Pan Am could have purchased its own requirements from other producers at prices similar to those charged by S. O. & G. Furthermore, it appears that, after the decision was made to have Pan Am embark on production on its own account, desirable properties were still available. We think the facts do not warrant the drastic and unprecedented relief here given.

## WILSON.

At the close of plaintiffs' case the trial court ruled that defendant Wilson, who did not become a director until November 26, 1934, was not liable on the processing or production issues and could be held responsible on the pipe line and purchasing issues, if at all, only on the renewal contracts; and that only defendants in office when the processing contract was signed could be held liable on the refinery issue. Nevertheless, the judgment holds Wilson liable on all three transactions on which the other directors were

held liable from November 24, 1934, two days *before* he became a director. A director is liable only for his own wrong. (*Holmes v. Crane,* 191 App. Div. 820; affd., 232 N. Y. 571.) The policies attacked had been made long before Wilson became a director. He would be liable only if his failure to act within the statutory periods of limitations resulted from his own negligence or fraud and was a concurring proximate cause in the damage. There was no finding that he was guilty of negligence or fraud. For these additional reasons the judgment against defendant Wilson was erroneous.

### PLAINTIFFS' APPEAL.

Finding there was no conspiracy, the trial court properly denied plaintiffs' motion to have all exhibits and oral testimony held admissible against all defendants and correctly ruled such evidence was admissible only against the several defendants who had part in the specific conversation or writing in question. From this ruling plaintiffs did not appeal. Yet in their briefs they frequently use against all defendant directors evidence held admissible only against Indiana or specified directors. In the absence of such appeal plaintiffs are concluded by the ruling, and the exhibits and oral conversations may be considered only against defendants who had part in the specified exhibit or particular conversation.

Plaintiffs' complaint and bill of particulars and proofs charged deliberate fraud, bad faith and conspiracy. At the close of plaintiffs' case, after hearing evidence for months claiming to support such charges, the trial court expressly found that there was no *prima facie* case of actual fraud shown against any of the defendants. That finding was never revoked. In a comprehensive opinion covering all the issues and embracing 190 pages of the record, ample facilities were afforded to say there was fraud or bad faith if the court intended so to find. It did not do so and dismissed the conspiracy count against all defendants.

The cases cited do not support plaintiffs' contentions which would deny Indiana the right to vote its own stock not merely at a particular meeting or for some particular purpose but at all times and for all purposes, although its stock was lawfully acquired and legally held. The effect of the additional injunctive relief asked for on plaintiffs' appeal herein would, in our opinion, be to deprive Indiana, majority stockholder holding seventy-eight per cent of the Pan Am stock, of its property rights in its own property. Indiana has a valid property right, the ownership of its stock carrying with it the inherent right to vote, and nothing has been shown to justify depriving it of such right. For these reasons, in addition to our rulings reversing the judgment on defendants'

appeal, the judgment, so far as appealed from by plaintiffs, should be affirmed.

## CONCLUSION.

This is not a case in which directors fraudulently in bad faith and with personal profit to themselves have deprived the minority of their *pro rata* share of the company's assets or frustrated the company in its business. The minority received their *pro rata* interest and, under the management of the directors attacked, the company expanded and prospered. At the time of the reorganization in 1933 the company was not producing oil; in 1939 it was producing from 5,000 to 6,000 barrels daily and had taken some 5,500,000 barrels from its property; it had acquired and built pipe line facilities, developed a fleet of tankers and built what is referred to as the most modern refinery in the world with a daily crude capacity of 93,000 barrels. Under the supervision and management of these directors gasoline sales have been increased from 8,800,000 barrels in 1933 to 16,300,000 barrels in 1939, and all sales have shown an increase in the same period of about $42,000,000. The earnings schedule has been changed from a net loss of nearly $1,500,000 in 1933 to net profits of more than $5,000,000 in 1939, and meanwhile nearly $9,000,000 dividends have been paid. The value of consolidated assets has risen from about $66,300,000 to about $90,300,000.

By the decree appealed from the defendant directors are forbidden under pain of contempt of court to determine on their own judgment whether Pan Am shall have a separate purchasing department or purchasing subsidiary or continue to handle its purchasing as it now does, through its own personnel; they are ordered to construct a gathering system and trunk pipe line whether or not in their own judgment it is wise and expedient for the company now to do so. In the final analysis on the facts disclosed the decree substitutes the court's judgment for that of the directors, and in its present form draws the court more and more deeply into the directorial management of the oil business, balancing the probabilities of profitable results, decreeing those which seem to the court to promise best results where there is a difference of opinion between minority and majority directors, and enjoining others. No case has been made out which plainly shows that the action taken was " so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company and in a manner inconsistent with its interests." (*Gamble* v. *Queens County Water Co., supra.*)

On plaintiffs' appeal the judgment, in so far as appealed from, should be affirmed, and on defendants-appellants' appeal the judgment, in so far as appealed from, should be reversed, with costs to the defendants-appellants, and the complaint dismissed on the merits, with costs.

MARTIN, P. J., and CALLAHAN, J., concur; TOWNLEY and COHN, JJ., dissent and vote to affirm.

Judgment, so far as appealed from by the plaintiffs, affirmed; judgment, so far as appealed from by the defendants-appellants, reversed, with costs to the defendants-appellants, and the complaint dismissed on the merits, with costs.    Settle order on notice.